## STATE OF CONNECTICUT *v.* ROBERTO MORALES
## (14908)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued October 27, 1994—decision released April 25, 1995

*Temmy Ann Pieszak*, assistant public defender, for the appellant (defendant).

*Donald A. Browne*, state's attorney, with whom, on the brief, was *John Smriga*, assistant state's attorney, for the appellee (state).

BERDON, J. The dispositive issue in this appeal is whether, in order to prove a claim that he has been deprived of due process of law under the state constitution, a criminal defendant must prove that the police acted in bad faith in failing to preserve potentially exculpatory evidence.

The defendant, Roberto Morales, was convicted after a court trial of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[1] robbery in

_____

[1] General Statutes § 53a-70 provides in pertinent part: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

the first degree in violation of General Statutes § 53a-134 (a) (3)[2] and threatening in violation of General Statutes § 53a-62 (a) (1).[3] The defendant appealed to the Appellate Court, which affirmed the judgment of conviction. *State* v. *Morales,* 33 Conn. App. 184, 634 A.2d 1193 (1993). We granted the defendant's petition for certification. *State* v. *Morales,* 228 Conn. 928, 640 A.2d 116 (1994).[4] We reverse the judgment of the Appellate Court and remand the case to the Appellate Court for further proceedings.

The following facts were elicited at trial.[5] On December 30, 1990, the victim was at the Pembroke Grill on

[2] General Statutes § 53a-134 provides in pertinent part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[3] General Statutes § 53a-62 provides in pertinent part: "THREATENING: CLASS A MISDEMEANOR. (a) A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ."

[4] The order limited certification to the following issues: "1. Did the Appellate Court properly conclude that, under the circumstances of this case, the proper test for ruling on the defendant's motion to dismiss, under article first, § 8, of the Connecticut constitution, was the test articulated in *Arizona* v. *Youngblood,* 488 U.S. 51 [109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989)]?

"2. If the answer to question (1) is yes, did the Appellate Court properly conclude, under the circumstances of this case, that: (a) a motion to dismiss was a proper remedy for the alleged failure of the state to preserve potentially exculpatory evidence; and (b) a different standard would apply to a motion to suppress evidence based on the same conduct of the state?" *State* v. *Morales,* supra, 228 Conn. 928.

With respect to issue 2 (b), see footnote 24.

[5] We limit our narrative to those facts that are necessary to decide and place in context the legal issues before us. We do not attempt to summarize all of the testimony elicited at trial, nor do we mean to recite only those facts which, on remand, may be weighed by the Appellate Court in its consideration of the balancing test we define in this opinion. For a more complete statement of the facts pertaining to the assault of the victim and the trial testimony, see *State* v. *Morales,* supra, 33 Conn. App. 184.

Pembroke Street in Bridgeport. She left the grill at approximately 11:45 p.m., walked down Pembroke Street and turned left onto East Main Street. While on East Main Street, she heard someone following her. She stopped at a phone booth and was approached by a man who tried to initiate a conversation with her. While the man spoke with a third person, however, the victim walked away and turned down Seymour Street.

On Seymour Street, the victim saw the same man following her, so she turned down Kossuth Street. As she reached a highway underpass, however, the man accosted her, grabbing her and punching her in the mouth. He then pulled a knife from his coat, placed it at her neck and pushed her down on her knees, telling her not to move or say anything. He also told her that if she did not keep her head down, he would kill her.

The man told the victim to unbutton and unzip her pants. He then removed her pants and underwear, moved behind her and held her around the neck. From that position, he penetrated her, ejaculating in her anus. He withdrew his penis and wiped it on the victim's leather jacket, leaving ejaculate "all over" the jacket. He then pulled off her necklaces and bracelet and fled.

After the assault, the victim went immediately to Bridgeport police headquarters, where she signed a statement narrating what had happened. The police then took her to Park City Hospital. At the hospital she repeated to the treating physician what she had told the police, i.e., that her assailant had sodomized her and that he subsequently had wiped his penis on her jacket. She told a nurse, however, that her assailant had sodomized her and also had raped her vaginally. The physician conducted several tests, including taking a swab and smear of the victim's anus and anal area, as well as her vagina. The police seized the victim's jacket as evidence.

Laboratory tests revealed the presence of partial spermatozoa on the anal swab and the presence of intact spermatozoa on the anal smear. Tests also revealed the presence of sperm on the vaginal swab. In accordance with established procedures, laboratory personnel did not attempt to conduct blood grouping tests on the anal swab or anal smear.[6] Blood grouping tests conducted on the vaginal swab, however, revealed an antigenic substance that could only have been deposited by a person with type A blood. The victim, who was type O, could not have been the source of that antigenic substance.

Sometime early in 1991, the victim, who did not have another winter jacket, sought to have the police return the jacket they had seized. The police, after repeated requests from the victim, finally returned her jacket on February 13, 1991, some six weeks after she had been attacked.

Three and one-half weeks after the police had returned the jacket, on March 11, 1991, the victim was a passenger on a bus in Bridgeport and saw the defendant standing on the corner of Stratford Avenue and East Main Street. She stayed on the bus for a few stops, then disembarked and called the police. The police transported the victim back to the corner of Stratford and East Main, where she identified the defendant as her assailant and the police arrested him. Tests subsequently conducted on the defendant revealed that his blood was type O, and that he could not have deposited the foreign antigenic substance found in the victim's vagina.

Prior to trial, the court granted the defendant's timely motion for general discovery and inspection, which required the police to produce exculpatory infor-

---

[6] Because of the high bacterial count in the anal area, 99 percent of blood grouping tests on these samples yield inconclusive results.

mation, materials and tangible objects. The defendant's counsel conceded that both he and prior defense counsel knew then of the existence of potential semen stains, but failed to ask specifically that the police produce the jacket.[7]

At trial, the defendant moved to dismiss the charges against him because the police had failed to preserve the victim's jacket as evidence. The defendant did not argue that the police, in returning the jacket to the victim, had acted in bad faith or that they had any motive for doing so other than accommodating the victim. Rather, the defendant argued that the fact that the jacket was unavailable had irreparably harmed his ability to defend himself in two ways. First, he argued that the defense could have conducted tests on the jacket to determine if semen was present. If tests showed no semen on the jacket, the defense could have used that result to attack the credibility of the victim. Second, if the tests showed that semen was, in fact, present on the jacket, the defense could have evaluated any

---

[7] The state argues that the defendant's failure to seek production of the jacket at this time reflects his "total pretrial indifference to any possible exculpatory interest in the item" and, therefore, that we should reject the defendant's appeal out of hand. This argument, however, does not take into account the facts of this case.

First, the state ignores the fact that the police returned the jacket to the victim nearly one month before the defendant was arrested on March 11, 1991, and, therefore, well before his attorneys knew about the existence of the jacket. Thus, even if the attorneys had specifically requested that the police turn over the jacket to the defendant or otherwise preserve it, the fact remains that the police no longer had the jacket in their possession.

Second, in addition to filing a general discovery motion, the defendant's attorneys did ask to inspect the victim's jacket. They were told by police, however, "that the jacket was 'long gone.'"

Finally, we have held that even if a defendant fails to seek production of evidence in a timely fashion, it is important for the state to preserve that evidence. The fact that a defendant failed to request the evidence goes to the issue of materiality and whether the defendant deemed it significant. *State* v. *Baldwin*, 224 Conn. 347, 365 n.13, 618 A.2d 513 (1993).

DNA[8] contained in the semen to prove that the defendant had not been the assailant. See generally *State* v. *Hammond*, 221 Conn. 264, 280–86, 604 A.2d 793 (1992). The trial court, however, denied the defendant's motion.

In the defendant's appeal from the judgment of the trial court, he argued to the Appellate Court that the failure of the Bridgeport police to preserve the victim's jacket had violated his right to due process of law under article first, § 8, of the Connecticut constitution. The Appellate Court, however, determined that the standard adopted by the United States Supreme Court in *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989), under the federal due process clause also was the proper standard under the state constitution's due process clause. In *Youngblood*, the Supreme Court concluded that a criminal defendant must prove that the police acted in bad faith in failing to preserve potentially useful evidence. Id., 58. The Appellate Court, noting that the defendant in this case had failed to show bad faith on the part of the police, concluded that his right to due process of law provided by article first, § 8, of our state constitution, similarly had not been violated.

We now consider (1) what degree of protection the due process clause of our state constitution offers to criminal defendants when the police fail to preserve potentially useful evidence, and (2) what remedy should follow if the defendant has established that a failure to preserve such evidence has violated his state constitutional rights.

---

[8] DNA is the abbreviation for deoxyribonucleic acid. See generally *State* v. *Sivri*, 231 Conn. 115, 151–62, 646 A.2d 169 (1994); *State* v. *Skipper*, 228 Conn. 610, 613–24, 637 A.2d 1101 (1994).

## I

We begin our analysis of the defendant's claim by setting forth the relevant legal background of "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Under the federal constitution, the state's failure to provide evidence within its control to a criminal defendant may violate the defendant's right to due process of law in two types of situations.

The first situation concerns the *withholding of exculpatory evidence* by the police from the accused. The United States Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [government]." *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990); *State* v. *Cohane*, 193 Conn. 474, 495, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); see *State* v. *Milner*, 206 Conn. 512, 539–40, 539 A.2d 80 (1988). This type of violation of the defendant's due process rights is commonly referred to as a *"Brady* violation."

The second situation, and the one at issue in this case, concerns the *failure of the police to preserve evidence that might be useful* to the accused. The United States Supreme Court discussed this situation in *Arizona* v. *Youngblood*, supra, 488 U.S. 51, a case in which the facts are remarkably similar to those in this case. In *Youngblood*, the child victim had been sodomized and the state had failed properly to preserve the child's clothing, which was stained with semen, and a swab

taken of the victim's rectum after the assault. The defendant claimed that, had the state properly preserved this evidence, test results might have completely exonerated him. The United States Supreme Court, however, held under the federal constitution that a criminal defendant carries a heavy burden in seeking to overturn a conviction based on the failure of the police to preserve evidence: "The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. . . . [U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id., 57–58; see also *California* v. *Trombetta*, 467 U.S. 479, 489, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984).

The defendant in this case, accordingly, does not claim that the state's failure to preserve the jacket of the victim constituted a violation of his rights under the federal constitution. Rather, raising an issue of first impression for this court,[9] he claims that, under the Connecticut constitution, a criminal defendant need not show that the police acted in bad faith in failing to pre-

---

[9] Although this issue has been previously raised in this court, we have not reviewed it on the merits. See *State* v. *Brosnan*, 221 Conn. 788, 812 n.20, 608 A.2d 49 (1992) ("Neither the Appellate Court, nor the defendant in [the Supreme] court, relied on an analysis of the state constitution. We, therefore, confine our analysis to federal constitutional standards."); *State* v. *Genotti*, 220 Conn. 796, 811, 601 A.2d 1013 (1992) (refusing to review issue under state constitution because defendant had failed to provide "a separate state constitutional analysis alleging a violation of his state due process rights").

serve potentially useful evidence. Because the defendant has raised this issue in a principled manner, furnishing us with a detailed analysis under a format that we have urged in raising state constitutional issues; see *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992);[10] we review his claim.

It is beyond debate that "federal constitutional and statutory law establishes a *minimum* national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Emphasis in original; internal quotation marks omitted.) *State* v. *Barton*, 219 Conn. 529, 546, 594 A.2d 917 (1991). In *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990), in which this court rejected the "good faith" exception to the exclusionary rule that the United States Supreme Court had adopted in *United States* v. *Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), we stated: "We have frequently relied upon decisions of the United States Supreme Court interpreting the fourth amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the pro-

---

[10] The *Geisler* tools of analysis for interpreting our state constitution are: (1) the textual approach; (2) holdings and dicta of the Supreme Court of Connecticut and the Appellate Court; (3) federal precedent; (4) sister state decisions or sibling approach; (5) historical approach; and (6) economic/sociological considerations.

The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party—the state or the defendant—can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. See, e.g., *State* v. *Joyce*, 229 Conn. 10, 16 n.7, 639 A.2d 1007 (1994). Finally, not every *Geisler* factor is relevant in all cases. See, e.g., *State* v. *Miller*, 227 Conn. 363, 381, 630 A.2d 1315 (1993).

tections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro*, 197 Conn. 219, 235–36, 496 A.2d 498 (1985). In so doing, we have recognized that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. *Horton* v. *Meskill*, 172 Conn. 615, 641–42, 376 A.2d 359 (1977)." (Internal quotation marks omitted.) *State* v. *Marsala*, supra, 159–60.

Indeed, we have long abandoned the notion that our state due process clause; article first, § 8;[11] has the same meaning and imposes the same limitations as its federal counterpart.[12] Rather, we have held that "[t]he due process clause of the Connecticut constitution shares but is not limited by the content of its federal

---

[11] The Connecticut criminal due process clause provides: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ." Conn. Const., art. I, § 8.

[12] The fourteenth amendment to the United States constitution provides in pertinent part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

counterpart. *Roundhouse Construction Corporation* v. *Telesco Masons Supplies Co.*, 168 Conn. 371, 374, 362 A.2d 778 [vacated, 423 U.S. 809, 96 S. Ct. 20, 46 L. Ed. 2d 29 (1975), on remand, 170 Conn. 155, 365 A.2d 393, cert. denied, 429 U.S. 889, 97 S. Ct. 246, 50 L. Ed. 2d 172 (1976)]." *Fasulo* v. *Arafeh*, 173 Conn. 473, 475, 378 A.2d 553 (1977); see also E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583, 588 (1986) ("[s]tate courts . . . must be empowered to determine, in light of state interests and state history, what meaning to attribute to provisions contained in state constitutions"). The question then becomes, what degree of protection, independent of the federal constitutional right, does our state constitutional right to due process provide in a case such as this?

A criminal defendant's right to present evidence and bring facts to light in order to prove his innocence has been historically recognized in Connecticut.[13] Chief Justice Zephaniah Swift, a prominent scholar as well as a jurist, wrote the first American treatise on the law in 1796. See 2 Z. Swift, A System of the Laws of the State of Connecticut (1796). He pointed out that many years earlier in England, and in the early days of the

---

[13] The language of our present due process clause can be traced back as far as the mid-seventeenth century. The statutory declaration of rights first enacted in 1650 provided that "no man's person shall be arrested, restrained, banished, dismembered, nor any ways punished . . . unless clearly warranted by the laws of this state." Statutory Declaration of Rights, Art. I, Public Statute Laws of Connecticut 24 (1808). This section was in the "original act, except a variation in the last clause, made at the revision in 1784. This is the first act in the code compiled by Roger Ludlow, Esq., in 1650; and is a transcript of an act of the Massachusetts colony passed in 1641." Id., 24 n.5; see generally C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 91–92 (1982). Our first formal constitution of 1818 incorporated this principle by guaranteeing that an accused shall not "be deprived of life, liberty or property, but by due course of law." Conn. Const., art. I, § 9 (1818).

Connecticut colony, an accused was denied the opportunity even to question evidence presented as "facts" by the prosecution. According to Swift, "by the common law of England, no witnesses could be adduced on the part of the prisoner, to manifest his innocence, for he could then make no preparation for his defence." Id., p. 399. The courts, he wrote, guided by "cruel and illiberal principle[s] of the common law of England," would prevent counsel for an accused from investigating facts or examining witnesses. Id., p. 398. Instead, the court would allow the attorney only to plead points of law. Id. By the time Swift wrote in 1796, however, the Connecticut legislature and courts had long abandoned "the impropriety and injustice of shackling and restricting a prisoner with respect to his defence." Id., p. 399. Recognizing that it "is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered," Swift explained that prisoners were allowed not only to present evidence in their own defense, but also to call into question those "facts" presented by the prosecution. Id.

Prior to the decision of the United States Supreme Court in *Youngblood*, we consistently had applied a balancing test in determining whether the failure of the police to preserve potentially useful evidence had deprived a criminal defendant of due process of law under either the federal or state constitution. Relying on decisions of federal courts interpreting the federal constitution's due process clause,[14] we had required a trial court, in determining whether the defendant had been deprived of his rights under either the federal or state constitutions, to weigh several factors. These factors included "the materiality of the missing evidence,

[14] See, e.g., *United States* v. *O'Neill*, 767 F.2d 780, 786 (11th Cir. 1985); *United States* v. *Vaughn*, 736 F.2d 665, 666 (11th Cir. 1984); *United States* v. *Herndon*, 536 F.2d 1027, 1029 (5th Cir. 1976).

the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985) (federal due process clause); *State* v. *Harden*, 175 Conn. 315, 327, 398 A.2d 1169 (1978) (federal and state due process clauses);[15] see *State* v. *McIver*, 201 Conn. 559, 565, 518 A.2d 1368 (1986); see also *State* v. *Baldwin*, supra, 224 Conn. 365; *State* v. *Marra*, 222 Conn. 506, 516, 610 A.2d 1113 (1992); *State* v. *Boucino*, 199 Conn. 207, 229, 506 A.2d 125 (1986). We refer to this test as the *Asherman* test. Although the United States Supreme Court in *Youngblood* held that due process under the federal constitution does not require a trial court to apply such a balancing test, we are persuaded that due process under our state constitution does.

Indeed, we frequently have rejected a litmus test that consists of only one factor, and instead have required courts to employ a balancing test, when ruling on issues that concern due process or fundamental fairness. In *Gaines* v. *Manson*, 194 Conn. 510, 521, 481 A.2d 1084 (1984), for example, we held that a court must employ a balancing test in determining whether the state's failure to provide a criminal defendant with timely access to appellate review had violated his state constitutional right to due process. "That test requires a consideration of four factors: [l]ength of delay, the reason for

[15] In *State* v. *Harden*, supra, 175 Conn. 326, the defendant argued that the loss of a black hair collected as evidence by the police had "resulted in substantial injustice to him, thus violating his right to a fair trial and due process of law under the Fourteenth Amendment of the United States Constitution and Article I, Section 8, of the Connecticut Constitution." (Internal quotation marks omitted.)

the delay, the defendant's assertion of his right, and prejudice to the defendant." (Internal quotation marks omitted.) Id.[16]

Similarly, we have employed a balancing test in determining the scope of due process to be afforded an individual before the government may deprive him or her of liberty or property interests. Borrowing from the federal constitutional standard enunciated by the United States Supreme Court in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), we have held that due process under the Connecticut constitution requires us to "consider three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Chmielewski* v. *Aetna Casualty & Surety Co.*, 218 Conn. 646, 662, 591 A.2d 101 (1991) (article first, § 10); *State* v. *Lamme*, 216 Conn. 172, 178, 579 A.2d 484 (1990) (article first, § 9); *Kinsella* v. *Jaekle*, 192 Conn. 704, 730, 475 A.2d 243 (1984) (article first, §§ 8, 9, 10); see *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra, 656 n.12, 661 n.17.[17]

---

[16] Although we borrowed the substance of this test from federal precedent; see *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); we decided the issue under the state constitution. *Gaines* v. *Manson*, supra, 194 Conn. 528 n.15; see *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, 229 Conn. 312, 317, 640 A.2d 101 (1994) (borrowing from federal precedent in order to craft "a framework for state constitutional analysis").

[17] We also have applied balancing tests to legal issues outside the constitutional framework. In the context of admissibility of evidence, for example, we have held that evidence of a defendant's past crimes is not admissible

In deciding *Youngblood*, however, the United States Supreme Court discounted the value of a balancing test in cases of unpreserved evidence, indicating instead that a litmus test of bad faith more accurately reflects the concerns of due process. The court advanced two principal arguments for its position: (1) in cases of unpreserved evidence, "courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed"; *Arizona* v. *Youngblood*, supra, 488 U.S. 57–58; and (2) a test that did not require the defendant to show bad faith might impose "on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance." Id., 58.

The *Asherman* balancing test, however, accommodates and addresses both of these concerns. It is true that if evidence has not been preserved, a court may not be able to ascertain with scientific precision what that evidence would have revealed at trial. Such certainty, however, is rarely required. Instead, an explanation or description of the type of evidence that is missing and what that evidence *may* have shown will allow the court to determine its relative importance to the defendant. The *Asherman* factors, which include balancing the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the

---

to prove the bad character or criminal tendencies of the defendant, even if it is relevant and material, unless the court first "conduct[s] a balancing test to determine whether the probative value of the evidence outweighed its prejudicial tendency. *State* v. *Braman*, 191 Conn. 670, 681, 469 A.2d 760 (1983)." (Internal quotation marks omitted.) *State* v. *Williamson*, 206 Conn. 685, 698, 539 A.2d 561 (1988). Likewise, in *State* v. *DeJesus*, 194 Conn. 376, 385, 481 A.2d 1277 (1984), we declined to hold that gruesome photographs of murder victims should be automatically excluded from evidence, holding instead that "the test to be applied to the admissibility of photographic evidence is whether it is relevant and then whether its probative value outweighs its prejudicial effect."

defense and the prejudice to the defendant caused by its unavailability, allow the court to perform this task while preserving the defendant's right to due process.

Moreover, the *Asherman* test does not require the police to preserve every shred of physical evidence, every object it seizes from a crime scene, no matter how remote or tangential to the case the item seems to be. The trial court should include on its *Asherman* scale the reason for the unavailability of an item of evidence, as well as the motivation and good or bad faith of the police in failing to preserve that evidence. For example, if the police have discarded or failed to preserve an item of evidence which at the time appeared to be completely irrelevant to the case but which later proved to be important to the defendant, the good faith of the police at the time of the evidence's destruction is one of the factors the trial court may consider in determining whether the defendant's due process rights have been violated.

Fairness dictates that when a person's liberty is at stake,[18] the sole fact of whether the police or another state official acted in good or bad faith in failing to preserve evidence cannot be determinative of whether the criminal defendant has received due process of law. Rather, our constitution imposes certain obligations on the state to ensure that the criminal trial is "a search for truth, not an adversary game." *United States* v. *Perry*, 471 F.2d 1057, 1063 (D.C. Cir. 1972); *State* v. *Wright*, 87 Wash. 2d 783, 786, 557 P.2d 1 (1976). As Justice Stevens pointed out in his concurring opinion

[18] "A fair trial is implicit in the term 'due process of law.' 'The requirements of due process are met in the trial of a person accused of crime if he has been given the benefit of a fair and impartial trial in accordance with the settled course of judicial proceedings in this state.' *Wojculewicz* v. *Cummings*, 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 (1958)." *State* v. *Asherman*, supra, 193 Conn. 724; *State* v. *Marra*, supra, 222 Conn. 516.

in *Youngblood*, "there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Arizona* v. *Youngblood*, supra, 488 U.S. 61; see note, "The Role of Police Culpability in *Leon* and *Youngblood*," 76 Va. L. Rev. 1213, 1223 n.59 (1990) ("Of course, there is the additional difficulty of proving that the police knew the evidence to be exculpatory. Few officers will be willing to admit they destroyed evidence they knew to be exculpatory.").[19] Furthermore, as the United States Supreme Court observed in *Brady* v. *Maryland*, supra, 373 U.S. 87, a court that truly seeks justice ought not to be concerned about the punishment of society for the misdeed of its agents and employees, but rather the "avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

---

[19] Although in *Arizona* v. *Youngblood*, supra, 488 U.S. 56–57 n.*, the Supreme Court of the United States did not precisely define "bad faith," the court did hold that the "presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."

As one commentator has written, "[i]f police knowledge of actual exculpatory value is indeed a required part of any showing of bad faith, the practical effect is to rob defendants of any meaningful due process protection in cases of destruction of potentially exculpatory evidence. If the defendant in one of these cases had evidence which could independently prove that the destroyed evidence would have been exculpatory, it is likely that that independent evidence would by itself exculpate the defendant, thereby rendering the destroyed evidence unimportant to the individual defendant. Thus, given that the defendant has the burden of proof, it is unlikely that any defendant who needs the protection will ever be able to satisfy the standard." Note, "The Role of Police Culpability in *Leon* and *Youngblood*," 76 Va. L. Rev. 1213, 1223 (1990).

Sister states have rejected *Youngblood*'s "bad faith" test as the sole criteria for determining whether the state has violated the defendant's due process rights by failing to preserve evidence.[20] In Massachusetts, for example, the Supreme Judicial Court has declared that "[t]he rule under the due process provisions of the Massachusetts Constitution is stricter than that stated in the *Youngblood* opinion"; *Commonwealth* v. *Henderson*, 411 Mass. 309, 311, 582 N.E.2d 496 (1991); and requires a trial court to "consider and balance the degree of culpability of the government, the materiality of the evidence, and the potential prejudice to the defendant in order to protect the defendant's constitutional due process right to a fair trial." Id., 310.

In Vermont, the Supreme Court has held that the *Youngblood* rule is "too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant." *State* v. *Delisle*, 162 Vt. 293, 310, 648 A.2d 632 (1994). Instead, the court has adopted, under the Vermont constitution, a balancing test that requires the trial court to conduct a "pragmatic balancing of three factors: (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial." (Internal quotation marks omitted.) Id.

In Delaware, the Supreme Court has stated that "[w]e remain convinced that fundamental fairness, as an element of due process, requires the State's failure to preserve evidence that could be favorable to the defendant [to] be evaluated in the context of the entire

---

[20] Apparently only Arizona and California, after conducting independent analyses of their state constitutions, have concluded that their state charters offer the same limited degree of protection as the federal constitution. See *State* v. *Youngblood*, 173 Ariz. 502, 844 P.2d 1152 (1993); *People* v. *Cooper*, 53 Cal.3d 771, 809 P.2d 865, 281 Cal. Rptr. 90 (1991).

record. . . . When evidence has not been preserved, the conduct of the State's agents is a relevant consideration, but it is not determinative." (Citations omitted; internal quotation marks omitted.) *Hammond* v. *State*, 569 A.2d 81, 87 (Del. 1989).

In Alabama, the Supreme Court refused to apply the *Youngblood* bad faith test to a case in which the state, during scientific testing of hazardous waste materials, had destroyed all the samples. *Ex Parte Gingo*, 605 So. 2d 1237 (Ala. 1992). The court concluded that, although the state did not act in bad faith, "it would be fundamentally unfair to allow the State to use the results of the . . . tests on the destroyed samples." Id., 1241.

Other states recently departing from the *Youngblood* approach include Hawaii; *State* v. *Matafeo*, 71 Haw. 183, 187, 787 P.2d 671 (1990) (trial court must inquire not only into bad faith of police, but also "into the favorableness of the evidence or the prejudice suffered by the defendant as a result of its loss"); and Alaska; *Thorne* v. *Dept. of Public Safety*, 774 P.2d 1326, 1330 n.9 (Alaska 1989) ("[w]e have construed the Alaska Constitution's Due Process Clause to not require a showing of bad faith").

Like our sister states, we conclude that the good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. Accordingly, we, too, reject the litmus test of bad faith on the part of the police, which the United States Supreme Court adopted under the federal constitution in *Youngblood*.[21] Rather, in determining

---

[21] Although we reject the holding of *Youngblood* under our state constitution, it nevertheless is clear that if a criminal defendant proves that the police, acting in "bad faith," had failed to preserve evidence, this failure would constitute a violation of his or her fourteenth amendment due process rights. The federal constitution, after all, provides a minimum baseline of rights beneath which states cannot tread. See *State* v. *Geisler*, supra,

whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the *Asherman* balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: "the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." *State v. Asherman,* supra, 193 Conn. 724.[22]

In a case such as this, where the crucial issue for which the evidence would have been offered was the identity of the assailant, the court must weigh the factors in that light. If, for example, the evidence could have been tested to demonstrate immutable characteristics of the assailant,[23] then the prejudice factor would weigh heavily in favor of the defendant. On the other hand, if the evidence would have been merely cumulative or would have failed to rebut evidence that was already available, the defendant may have suffered little prejudice, and his right to due process of law under article first, § 8, of the Connecticut constitution may not have been violated.

222 Conn. 684; *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984); *Doe* v. *Maher,* 40 Conn. Sup. 394, 419, 515 A.2d 134 (1986).

[22] In measuring the degree of prejudice to an accused caused by the unavailability of evidence, the trial court properly may evaluate the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case. Such a consideration is consistent with the approach taken by courts in other jurisdictions. As noted previously, for example, trial courts in Vermont must take into account not only the importance of the missing evidence and the fault of the government, but also "other evidence of guilt adduced at trial." *State* v. *Delisle,* supra, 162 Vt. 310.

[23] Neither party has raised the issue of whether it would have been scientifically possible for the defendant to conduct tests for semen or DNA matter even if the police had properly preserved the jacket.

## II

Our inquiry, however, does not end here. We still must determine whether, in a case in which the failure of the police to preserve potentially exculpatory evidence violates the defendant's due process rights, the trial court's only remedy is to dismiss the charges against the defendant.

It is true that a defendant may raise the issue of the failure of the police to preserve potentially exculpatory evidence by filing a motion to dismiss.[24] Indeed, the defendant in this case challenged the actions of the Bridgeport police by filing just such a motion. Neverthe-

[24] We reject the suggestion of the Appellate Court that the nature of the motion filed by the defendant determines both the substantive test the court must apply and the remedy it may order. The Appellate Court held that the bad faith test of *Arizona* v. *Youngblood,* supra, 488 U.S. 58, applies only "to allegations of due process violations arising out of a motion to dismiss the prosecution for failure by the state to preserve potentially exculpatory evidence. The four-prong test still applies to claims of due process violations arising out of a motion to suppress the admission of testimony about destroyed evidence. See *State* v. *Marra,* [supra, 222 Conn. 516]." *State* v. *Morales,* supra, 33 Conn. App. 193 n.11.

We recognize that previous decisions of this court have not been entirely clear on this point, and that the Appellate Court, in reaching its decision, was attempting to discern the correct rule of law from conflicting authority. Nevertheless, we now hold that such a distinction is untenable, and that a defendant may challenge the police's failure to preserve potentially exculpatory evidence by filing *either* a motion to dismiss or a motion to suppress. Moreover, as we point out in the text of this opinion, the nature of the motion the defendant chooses to file does not dictate the remedy the trial court may craft in order to ameliorate the prejudice to the accused. In other words, a trial court confronted with a motion to dismiss is not limited to dismissing all charges against the defendant, and a trial court confronted with a motion to suppress is not limited to suppressing testimony about the unpreserved evidence. Rather, in either case, the trial court has discretion to craft an appropriate remedy that ameliorates the prejudice suffered by the defendant as a result of the loss of the evidence. Of course, if the trial court contemplates a remedy different than that proposed by either of the parties, the court should provide the state and the defendant with prior notice of its proposed remedy and an opportunity to comment on the appropriateness of it.

less, if the trial court concludes that a defendant's due process rights have been violated, the court is not required to dismiss the charges, even if the state's failure to preserve evidence has adversely affected the defendant's right to a fair trial. *State* v. *Belle*, 215 Conn. 257, 269–71, 576 A.2d 139 (1990); see *Gaines* v. *Manson*, supra, 194 Conn. 518. The trial court is not faced with the Hobson's choice of either dismissing all criminal charges or denying any relief whatsoever to a criminal defendant who possibly has been prejudiced as a result of the negligence of the state. See *Dowd* v. *Cook*, 340 U.S. 206, 209–10, 71 S. Ct. 262, 95 L. Ed. 215 (1951).

Rather, the trial court may fashion another remedy that appropriately ameliorates or offsets the prejudice that the defendant has suffered as a result of the unavailability of the evidence. See *Gaines* v. *Manson*, supra, 194 Conn. 517–18 ("[p]roof of unconstitutional impairment of the right to appeal empowers a court to fashion an order conditionally discharging the petitioner or otherwise fashioning the appropriate relief, short of immediate release, to which the petitioner may be entitled"). In some extreme cases, the trial court may have no choice but to dismiss the charges against the defendant. In another case, however, the appropriate remedy may differ, depending on the circumstances and the degree and type of prejudice to the accused.

Put simply, a trial court must decide each case depending on its own facts, assess the materiality of the unpreserved evidence and the degree of prejudice to the accused, and formulate a remedy that vindicates his or her rights. *State* v. *Vaster*, 99 Wash. 2d 44, 52, 659 P.2d 528 (1983). The ultimate question for the trial court in such a case is: What remedy best serves the interests of justice? See *State* v. *Fain*, 116 Idaho 82,

96–97, 774 P.2d 252, cert. denied, 493 U.S. 917, 110 S. Ct. 277, 107 L. Ed. 2d 258 (1989); *Commonwealth v. Henderson,* supra, 411 Mass. 310.[25]

### III

In this case, the record is clear that the trial court, in deciding the defendant's motion to dismiss, attempted to apply a balancing test quite similar to the one we have defined today. In his appeal to the Appellate Court, the defendant argued that, although the trial court had applied a balancing test, it had not applied that test correctly. Because the Appellate Court concluded that the trial court should have applied the *Youngblood* test, and not a balancing test, the Appellate Court never reached the merits of the defendant's argument. We therefore must remand this case to the Appellate Court for further proceedings.

The judgment of the Appellate Court is reversed, and the case is remanded to the Appellate Court with direction to reconsider the defendant's claim regarding the state's loss of evidence.

In this opinion PETERS, C. J., and CALLAHAN and KATZ, Js., concurred.

BORDEN, J., concurring. I agree with the conclusion of the majority opinion, and with much of its reasoning. More specifically, I agree that the bad faith of the police, in failing to preserve potentially exculpatory evidence, is not the sole determinant as to whether the defendant's right to due process of law under article

[25] Indeed, one of the factors that prompted Justice Stevens to concur, rather than dissent, in *Arizona* v. *Youngblood,* supra, 488 U.S. 59, was the trial court's instruction to jurors in that case that they might draw an adverse inference against the state for failing to preserve the evidence. Certain situations, in fact, might *require* the trier of fact to "presum[e] that the [evidence] would have been favorable to [the accused]." *Thorne* v. *Dept. of Public Safety,* supra, 774 P.2d 1332.

first, § 8, of our state constitution has been violated by that failure. Thus, for the reasons aptly stated by the majority, I agree with the majority's rejection of the federal constitutional bad faith test, as articulated by the United States Supreme Court in *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S. Ct. 885, 102 L. Ed. 2d 1007 (1989), and with the adoption of the balancing test under the state constitution, as articulated by the majority. I write separately, however, to elaborate further some aspects of the majority opinion. Also, with respect to part II of the majority opinion, I think that the discussion of the possible remedies once a due process violation is found to have occurred in a specific case requires more than the majority provides.

I

I believe that the majority's statement of the relevant facts is unduly truncated. Because the balancing test we adopt requires an assessment of the strength or weakness of the state's and the defendant's cases, the majority opinion should disclose all of the evidence on the basis of which that assessment should be made. In addition to those facts stated by the majority, I therefore add the following.

The only evidence linking the defendant to the crimes charged was the testimony of the victim identifying him as her assailant. According to that testimony, she had several opportunities to view the defendant. The first was at the phone booth, where he first approached and conversed with her. The second was as she was walking on the street and he was following her; she looked at him face to face as he was "across the street" from her while she walked in the middle of the road. The third was when, according to her testimony, he punched her in the mouth before sexually assaulting her. The

fourth was shortly after the attack, while she was in a car being driven by her girlfriend's husband, who had been passing by and picked her up and drove her to the police station. The fifth was some time after the assault, when, according to her testimony, she was riding on a bus and saw the defendant on the sidewalk; the victim was with her boyfriend, but told him not to accost the defendant, to "just leave it alone." The sixth was at the time of the defendant's arrest, when she saw the defendant on the corner of Stratford Avenue and East Main Street, as described by the majority.

The victim positively identified the defendant in the courtroom as her assailant. Furthermore, in her written statement to the police on the day after the assault, she described the defendant as follows: "He was P/R [Puerto Rican] male about 30 or 31 years old about 5 [feet] 7 [inches] tall [medium] build, he had brown eyes and brown hair. His hair was curly and short to his head. He was top heavy and had skinny legs. *He had a mustache that came below his top lip.* He had short stubby hands and his nails were all black like he was a mechanic, his finger nails were all covered with grease. He had a wedding band on his left hand that was diamond cut and it had three stars in it. *His front teeth were straight but he had like a fang in the middle of the front teeth.*" (Emphasis added.) Her testimony was consistent with this description. She described the defendant's tooth as "like a fang. It was like it came in the middle of his mouth, straight down in the middle of his two front teeth." A photograph of the defendant, taken on March 8, 1991, is consistent with this description, particularly indicating a mustache that falls below the outer edges of the defendant's lips, and a distinctively pointed tooth in the center between his two top teeth. The victim identified this photograph

as indicating what she meant by her description of the defendant's front tooth.[1]

On the other side of the ledger, the victim's credibility was not unassailable. She had been convicted of failure to appear in the first degree, larceny in the second degree, larceny in the first degree and larceny in an unspecified degree. Furthermore, before encountering the defendant, she had been drinking in a bar for approximately three and one-half hours, and had consumed five or more drinks consisting of "forty-three liquor and milk." Although she denied being drunk, she admitted that she was "feeling good."

There were, moreover, some inconsistencies in her testimony. Although she testified that she had never seen the defendant before, she told the police in her statement that, when he had approached her at the phone booth he had told her his name, that he knew her father, and that he knew that her father had been shot, which was in fact true. Also, although she testified that the defendant had punched her in the mouth, causing "bad" bleeding, the hospital report did not confirm that injury. Furthermore, although she testified that the defendant had penetrated her anally, and not vaginally, and had described the assault that way to both the police and the examining physician, the nurse's notes also indicated her having reported a vaginal penetration.[2]

---

[1] In final argument to the trial court, which was the fact finder in this case, the defendant's counsel, although arguing that the state had failed specifically to prove that this was an unusual dental configuration among the general population, conceded the inculpatory value of the victim's description of the defendant's tooth: "and, in fact, you have the tooth for my defendant."

[2] There was also testimony, however, that could explain the presence of semen in the victim's vagina that, by the scientific tests, could not have been deposited by the defendant. That evidence was that such tests could be the result of the presence of seminal fluid in the vagina for as long as seventy-two hours after intercourse. The victim was not asked whether she had engaged in sexual intercourse within the previous seventy-two hours.

Ultimately, the trial court, having heard all of the evidence, believed the victim's identification of the defendant. In finding that the state had proven "beyond a reasonable doubt . . . that the defendant was responsible for the attack," the court stated: "Her description was a very accurate and detailed one. There was plenty of opportunity, both outside the restaurant, at the phone booth and subsequently, for her to have seen this individual. The court heard her testimony, watched her as she identified the defendant very, very quickly and very adamantly as the person that was responsible."

## II

In footnote 7 of the majority opinion, the court correctly rejects the state's argument that the defendant's failure to seek inspection of the victim's jacket reflected a total pretrial indifference by the defendant to the possible inspection and testing of any stains on the jacket. As it stands, however, the footnote ignores a valid consideration on the other side of the equation that ought to be mentioned, a factor that the trial court in fact did take into consideration in denying the defendant's motion to dismiss.

The police returned the jacket to the victim on February 13, 1991, approximately one month before the defendant was arrested on March 11, 1991. A public defender was appointed to represent the defendant at his arraignment on that day.[3] The defendant, however, did not take any procedural step specifically regarding the jacket until he moved to dismiss the state's case at the end of the state's presentation of evidence at trial on April 27, 1992, more than one year later.

---

[3] A special public defender was appointed for the defendant on February 26, 1992, and he conducted the defendant's defense at trial. Nonetheless, the defendant was represented by the public defender until that appointment took place.

Thus, although the state is properly faulted for returning the jacket to the victim, the defendant is not entirely without fault. It is at least possible that, had the defendant asked for the return of the jacket for testing as early as March, 1991, when the defendant was arrested and counsel was appointed to represent him, or, at the latest, in February, 1992, when his special public defender was appointed, the jacket could then have been retrieved from the victim. If the jacket had not been cleaned or otherwise irreparably contaminated, at that time it could have been tested for the presence of semen and for any forensic evidence that any semen would have yielded. My point is that, although certainly the greater fault is attributable to the state for the unavailability of the jacket, some fault may be attributable to the defendant.

### III

In analyzing the issue before the court under the state constitution, the majority opinion cites and quotes from Chief Justice Zephaniah Swift, presumably as support for the "historical approach" that we have identified as a tool of analysis for interpreting our state constitution. See footnote 13 of the majority opinion; *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). I agree that the historical approach is one of the applicable tools of analysis for such questions of interpretation, when that history sheds light on the constitutional question involved. I also agree that Chief Justice Swift's writing can at times be a useful source for that inquiry. I decline to join the part of the majority opinion referring to Swift in this case, however, because the particular passage from Swift has nothing to do with the question of state constitutional law that this case poses.

In the passage that the majority quotes, Swift pointed out that Connecticut had wisely expanded counsel's role

from arguing points of law to include the investigation and presentation of facts. That is an important historical point with respect to the history of the right to counsel in this state, but I fail to see how that expansion of counsel's role sheds any historical light on the question before us in this case, namely, the contours of the state's obligation to preserve important evidence. It is true that both the expanded right to counsel and the preservation of evidence—by anyone, the state, the defendant, or a third party—aid in the search for truth. The same is true, however, for the rules of evidence, the right to cross-examine, the right to argue to the jury, and most other trial procedures. The fact that both the right to counsel and the obligation to preserve evidence serve the same general end does not mean that we can draw any useful historical lesson in this case from the writings of Chief Justice Swift.

## IV

I decline to join the majority's overly broad statement that *"as the United States Supreme Court observed in Brady v. Maryland, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)], a court that truly seeks justice ought not to be concerned about the punishment of society for the misdeed of its agents and employees,* but rather the 'avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.' " (Emphasis added.) I fully agree with the propositions that courts must ensure that an accused is given a fair trial, that society wins when criminal trials are fair, regardless of their outcomes, and that justice suffers when an accused is treated unfairly. I am not quite sure, however, what it means to say that "a court that truly seeks justice ought not to be concerned about the punishment of society" for its agents'

misdeeds. It seems to me to be a rhetorical flourish that is open to many interpretations, from the benign to the mischievous.

Furthermore, whatever it means, it is not what the United States Supreme Court "observed" in *Brady*. The court was discussing its holding that suppression of material exculpatory evidence that the defendant had sought to discover violated his due process rights. The court had drawn this holding from its earlier decision in *Mooney* v. *Holohan,* 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935), and the progeny of that decision. In *Mooney,* the court reversed a conviction that had been based on knowingly perjured testimony, and in *Brady* the court was analogizing those cases to its holding regarding the suppression of exculpatory evidence, regardless of the good faith of the prosecution. The court then stated: "The principle of *Mooney* v. *Holohan* [supra] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady* v. *Maryland,* supra, 373 U.S. 87. I agree fully with this principle, but I disagree that it means what it is characterized to say in the majority opinion.

Finally, those statements in *Brady* were made in a different factual and legal context from this case. The *Brady* situation involves the suppression of exculpatory evidence. In that situation, we know that: (1) the evidence was suppressed—the state had it, and did not make it available to the defendant despite his request therefor; and (2) the evidence was in fact exculpatory, and the state knew it. In this case, by contrast: (1) the evidence was not suppressed, but was negligently given back to the victim by the state, and thus was just as

unavailable to the state as it was to the defendant;
(2) the nature of the state's conduct, in the sense of
whether it was done in good or bad faith, in losing the
evidence *is* a factor to be weighed; and (3) we do not
know, and can never know, whether the evidence was
exculpatory or inculpatory—whether tests of the semen
stains on the jacket would have exculpated or incul-
pated the defendant. Thus, we have no way of know-
ing whether the return of the jacket to the victim hurt
the defendant or the state. I therefore think that the
majority's rhetorical flourish, which mischaracterizes
the *Brady* court's "observation," is inappropriate, and
I decline to join it.

V

My final remarks concern part II of the majority opin-
ion, which is devoted to the remedies available to the
trial court upon a conclusion that the state's failure to
preserve evidence amounted to a violation of the
defendant's due process rights. I think that some of
the majority's discussion warrants further elaboration.

A

I agree with the majority opinion that a trial court,
having determined on a motion to dismiss or a motion
to suppress that the state's failure to preserve evidence
violated the defendant's due process rights, is not
limited to the specific remedy sought by the defend-
ant. I think, however, that the proposition is too broadly
stated by the majority, because it implies that, even
absent some suggestion by the defendant, the trial
court has a sua sponte *obligation* to consider a remedy
other than that sought by the defendant. I agree that,
if a trial court does think of a different remedy than
that sought by the defendant, it certainly has the power
to impose it. I am loathe to imply, however, that a trial
court, faced with a specific remedy sought in a specific
motion, cannot also simply take the motion as presented

and either grant or deny it. This point is particularly significant in this case because, when the defendant moved to dismiss after the state's presentation of all of its evidence he asked only for dismissal, and did not ask for any other, less extreme sanction. He had not moved to suppress any evidence based on the loss of the jacket, and he did not request the court to employ the less drastic remedy of an adverse inference against the state in the court's final determination of guilt or innocence. Thus, the trial court was never presented with a request to do anything but dismiss the case.

B

I also agree with the majority opinion that the appropriate remedy is a matter for the trial court in the first instance, and that the ultimate test is: "What remedy best serves the interests of justice?" Since we are, appropriately in my view, giving guidance to the trial courts regarding this issue, however, I would also suggest that the available remedies fall on a spectrum. At the least drastic end of the spectrum would be a remedy or combination of remedies such as affording the defendant unusually broad latitude on cross-examination, or employing an adverse inference against the state, or both. See, e.g., *State* v. *Marra*, 222 Conn. 506, 515–16, 610 A.2d 1113 (1992). Another, more severe, remedy would be the suppression of some or all of the other evidence that the defendant was arguably hampered in challenging as a result of the loss of the evidence. The most drastic remedy would be dismissal of the prosecution. There could, of course, be other remedies, or combinations thereof, at different points along the spectrum.

With respect to the remedy of dismissal, I would make it clear that, because it is the most drastic remedy available, it ought to be reserved for those cases in which no lesser remedy can plausibly vindicate the

defendant's right to a fair trial. We have referred to dismissal of the prosecution as a drastic remedy. *State v. Bergin*, 214 Conn. 657, 662, 574 A.2d 164 (1990). Although I agree that there may be cases in which dismissal of the prosecution would be the only appropriate remedy for the violation of the defendant's due process rights, I would reserve that most drastic remedy for the most drastic and prejudicial violations.

This principle is particularly important in a case such as this because we are dealing with the unknowable. We can never know whether the loss of the evidence, the jacket in this case, in fact harmed the defendant or helped him. This is so because, as plausible as it is that forensic tests on the jacket could have exonerated him, it is equally plausible that they could have inculpated him. Thus, the trial court, in dismissing the case, would be dismissing a case in which the fact finder could have found the defendant guilty beyond a reasonable doubt based on the evidence that *was* available. Indeed, in the case at hand, the trial court found precisely that.