IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MARCH 1995 SESSION



**FILED**

**January 7, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9406-CR-00207 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Hon. J. Randall Wyatt, Jr., Judge |
| | ) | |
| RICKY HILL KRANTZ, | ) | (First Degree Murder and Aggravated Assault) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Karl Dean
District Public Defender
    and
Jeffrey A. DeVasher
Michele S. Hall
Sheila Jones
Assistant Public Defenders
Stahlman Bldg.
211 Union Street
Nashville, TN 37201-5066
(ON APPEAL)

David M. Siegel
Jeff Powell
Assistant Public Defenders
Stahlman Bldg.
211 Union Street
Nashville, TN 37201-5066
(AT TRIAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Christina S. Shevalier
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
        and
Katrin Novak Miller
Nicholas Bailey
Assistant District Attorneys General
102 Metro Courthouse
Nashville, TN 37201

OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Ricky Hill Krantz, appeals as of right from his conviction by a jury in the Davidson County Criminal Court for felony murder and aggravated assault, a Class C Felony. The defendant was sentenced to life imprisonment for the felony murder conviction and as a Range II, multiple offender to seven years in the custody of the Department of Correction for the aggravated assault conviction. The trial court ordered the defendant's sentences to be served consecutively. The defendant contends that:

> (1) the evidence is insufficient to support the first degree murder conviction;
>
> (2) the trial court erred by not dismissing the indictment due to the state's failure to preserve a blood sample taken from the defendant on the evening of the offense;
>
> (3) the trial court erred by not dismissing the indictment upon grounds of fundamental fairness because the defendant should not have been retried after a mistrial upon a theory that was not relied upon by the state in the first trial; and
>
> (4) the trial court erred by allowing the state to use a peremptory challenge in a discriminatory manner in violation of the Sixth and Fourteenth Amendments to the United States Constitution and in violation of Article I, Section 9 of the Tennessee Constitution.

We conclude that the evidence is sufficient and that the trial court did not err as the defendant claims. We affirm the trial court's judgment of conviction.

The defendant was tried for the first degree murder of Dan Newland and for the attempted first degree murder of Gary Dean Harris. The evidence related to the events that occurred during the early morning hours of February 1, 1993, when the defendant and Jack Speakman got into an altercation at the Next Door Tavern.

Gary Dean Harris, the victim of the aggravated assault and an acquaintance of the defendant, testified that on January 31, 1993, Superbowl Sunday,

2

he visited Big O's Tavern at approximately 3:00 p.m. where he drank beer, ate some food, and watched some of the football game. He stated that he saw the defendant at the tavern.

Mr. Harris said that he then left the first tavern and went to the Next Door Tavern. He stated that the defendant arrived at some point in the evening. He said that he spoke to the defendant, and he did not believe that the defendant was intoxicated. According to Mr. Harris, the defendant did not have difficulty walking and his speech was not slurred. Mr. Harris testified that he later saw the defendant and Kevin Williams arm wrestling across the room. He said that he had seen Mr. Williams but not the defendant arm wrestle at the Next Door Tavern on earlier occasions. Mr. Harris testified that he then saw the defendant and Mr. Williams fighting on the floor. Mr. Harris said that he did not know how or why the fight started.

Mr. Harris testified that he and Dan Newland helped break up the fight. He said that after the fight was broken up, the defendant left the tavern. He stated that a while later, he was walking away from the tavern's front door when he felt a piece of wood strike him in the back. Mr. Harris testified that he looked behind him and saw the door of the tavern open with someone standing in the doorway with a gun. He said he saw Mr. Williams kick the door closed, heard a gunshot, and felt the gunshot hit him in the back. Mr. Harris testified that he then lost consciousness and did not remember anything until he woke up in the hospital.

Jack Speakman testified that he had known the defendant for several years. Mr. Speakman said that on January 31, 1993, at approximately 10:30 or 11:00 p.m., he and the defendant were shooting pool at the Next Door Tavern when the defendant wanted to arm wrestle. Mr. Speakman stated that he told the defendant that he did not want to arm wrestle but that he knew someone who would. He introduced

3

the defendant to Kevin Williams, a friend of Mr. Speakman's, and the defendant and Mr. Williams agreed to arm wrestle. Mr. Speakman testified that he and another man who he did not know bet money on the first match, which Mr. Williams won. Mr. Speakman stated that the defendant and Mr. Williams then agreed to a second match.

Mr. Speakman testified that before the second match actually started, the defendant grabbed Mr. Williams' hand, slapped it down on the bar, and picked up the money. Mr. Speakman said that as the defendant got up to leave, he put the defendant in a neck hold and threw him to the ground. He stated that Mr. Williams then grabbed the money from the defendant while the defendant was on the floor. Mr. Speakman testified that he was pulled off of the defendant by his wife and others.

Mr. Speakman testified that the defendant got up and walked out of the tavern. He said that the defendant was angry when he left. He stated that Keith Walker followed the defendant out of the tavern to talk to the defendant. Mr. Speakman testified that he also went outside the tavern after approximately fifteen to twenty seconds. He said that he saw the defendant get into his truck. Mr. Speakman stated that the defendant was speaking to Mr. Walker through the truck window when the defendant yelled at Speakman, "I'll be back to kill you, you S.O.B." He said that he also heard the defendant state that he was going to go home to get a gun and kill everybody in the tavern. Mr. Speakman testified that he heard the defendant start the truck engine, and he said that he told the defendant that he would not be at the tavern before he walked back inside and told his wife that it was time to leave, and the two of them left. He said that they did not drive in the direction the defendant went along Old Clarksville Pike to get home but rather took another direction to pick up his motorcycle at a friend's house.

4

Mr. Speakman also testified that the defendant did not have trouble walking or being coordinated as he was playing pool. He stated that the defendant was capable of hitting the ball. He said that the defendant did not have any trouble speaking and his speech was not slurred. Mr. Speakman testified that he did not believe the defendant was drunk. On cross-examination, Mr. Speakman admitted that he also yelled at the defendant while outside the tavern. Mr. Speakman conceded that he had been drinking since the start of the football game and estimated that he had drunk seven or eight beers. He also testified that he did not believe that the defendant was more intoxicated than Mr. Newland or Mr. Harris.

Kevin Williams testified that he had known the defendant for several years before the night of the shooting, and he said that he and the defendant had arm wrestled on previous occasions. He stated that there was nothing extraordinary about the first arm wrestling match until the defendant accused him of cheating. Mr. Williams testified that he offered to wrestle the defendant again, but before he could get in position, the defendant grabbed his hand, slammed it on the bar, grabbed the money that was bet on the match, and walked towards the door. Mr. Williams stated that he then saw Jack Speakman wrestle the defendant to the floor, causing the money the defendant was holding to fall to the floor. He said someone picked up the money and handed it to him. Mr. Williams testified that the defendant left the tavern after he got up off the floor.

Mr. Williams testified that about five to ten minutes after the defendant left the tavern, he saw Mr. Speakman also walk outside. Mr. Williams said that shortly after the defendant left, Keith Walter said something to him that made him feel that he should leave and go home, although he decided to stay at the bar. He said that approximately thirty to forty minutes after the defendant left the tavern, he saw the tavern door fly open, a portion of a long gun come in, and Dan Newland falling to the

5

floor after a shot was fired. Mr. Williams testified that he then went to the door, pushed the door closed, and attempted to grab the portion of the gun barrel sticking through the door. He said that the gun was wrestled from his grasp and a shot was fired through the door, missing Williams but striking Dean Harris in the back. He stated that he then told his wife to go out the back door and he quickly followed her out. Mr. Williams said that he and his wife went to Mr. Speakman's house. Mr. Williams testified that he could not identify the shooter because he only saw the shooter's arms and a portion of the gun.

Mr. Williams testified that the defendant did not have any trouble walking, talking or moving around as they were arm wrestling. He also stated the defendant's speech was not slurred. On cross-examination, Mr. Williams conceded that on the night of the offense, he had been drinking for several hours while at a Super Bowl party and also at the tavern. He approximated that he had drunk nine beers. Mr. Williams stated that he did not believe that he was intoxicated. He testified that no one was "falling down drunk," including the defendant.

Martha Bryant, an employee of the Next Door Tavern, testified that she lived next door to the tavern and that she was at the tavern on the night of the shooting, although she was not scheduled to work that night. She said that as she was helping an employee clean tables, she saw the defendant and Kevin Williams arm wrestling. Ms. Bryant testified that she did not pay much attention to the arm wrestling match until she saw Jack Speakman and the defendant on the floor surrounded by several people. She said that she did not see anyone strike or hit the defendant. Ms. Bryant stated that she heard the defendant, on his way out of the tavern, say that he was going to go get a gun and kill everyone. She said that the defendant appeared mad and upset but that she did not notice any injuries sustained by the defendant. Ms. Bryant testified that she

did not take the defendant's threat seriously, although she went home immediately after the defendant left the tavern at approximately 10:30 p.m.

Ms. Bryant testified that she returned to the tavern at approximately 11:15 p.m. She stated that she was dancing with Dan Newland when she saw a gun barrel through the door, heard two gunshots and then saw Mr. Newland and Dean Harris fall to the floor. She said that she was scared and told everybody to get down. Ms. Bryant stated that she then checked on Mr. Newland and Mr. Harris and called 911. Ms. Bryant testified she then saw the defendant holding "a long-barred gun . . ., like a shotgun." She also did not see Beverly Hunter, the defendant's cousin, at the tavern that night.

Ms. Bryant testified that she believed that the defendant had been drinking, but she said that the defendant was able to walk and that his speech was not slurred. In Ms. Bryant's opinion, the defendant did not at any time during the night of the offense act in a way to make her believe that he was not aware of his surroundings or not able to understand what was happening. On cross-examination, Ms. Bryant conceded that she was not paying attention to everything that was going on because there was a big crowd at the tavern that night.

Rita Williams, Kevin Williams' wife, testified that at the time of the shooting, she had known the defendant for five or six years. She said that she went to the Next Door Tavern with her husband on the night of the shooting, and she stated that while at the tavern, she briefly spoke to the defendant. Ms. Williams stated that the defendant's speech was not slurred and that he did not have any trouble talking. Ms. Williams testified that she was not drinking on the night of the offense.

7

Ms. Williams testified that she was sitting two tables away from the defendant and her husband when the arm wrestling match took place. She said that she was not paying much attention to the match but that she recalled seeing Jack Speakman throw the defendant to the floor and tell him to let go of the money. She stated that both she and Pam, Mr. Speakman's wife, tried to calm Mr. Speakman so he would release the defendant. Ms. Williams testified that after Mr. Speakman let go of the defendant, the defendant left the tavern. She said that she did not notice any blood or bruises on the defendant's face. She also stated that she did not hear the defendant say anything as he left.

Ms. Williams testified that approximately forty-five minutes after the defendant left, she saw the door to the tavern open and the defendant standing with a shotgun. She said that she then heard a shot and saw Dan Newland fall to the floor. She stated that she dropped to the floor and then heard a second shot. Ms. Williams recalled seeing someone else fall to the floor. She testified that she then went out the back door where she met her husband. Ms. Williams stated that she and her husband then drove to Mr. Speakman's house and told him about the shooting.

Ms. Williams testified that she saw the defendant drinking beer and playing pool that night. In her opinion, the defendant did not appear to have trouble standing up or playing pool. On cross-examination, Ms. Williams stated that she saw blood on the defendant's face when he returned to the tavern with the gun. She also testified that the defendant was friends with both of the victims. She said that the defendant opened the door and fired the shot, and she stated that the defendant was looking at Mr. Newland when he shot the gun.

Keith Walker testified that he had known the defendant for several years. He said that he was at the Next Door Tavern on January 31, 1993, when the defendant

8

and Mr. Williams were arm wrestling. Mr. Walker stated that he was shooting pool and not paying attention to the arm wrestling. He said that he heard a commotion, turned around, and saw Jack Speakman on top of the defendant. He testified that he saw several people surrounding the pair, and he said that Mr. Speakman had to be pulled off of the defendant. Mr. Walker stated that the defendant walked outside the tavern and stated that he was going to get a gun and come back to the tavern.

Mr. Walker testified that he followed the defendant to try to calm the defendant. He said that Mr. Speakman followed him out of the tavern, keeping a little distance behind him. He testified that he spoke to the defendant outside the tavern, and the defendant stated a couple of times that he was going to get his gun and come back and kill Mr. Speakman and Mr. Williams. Mr. Walker said that the defendant then got inside his truck but continued to talk to him through the window. He recalled that the defendant and Mr. Speakman exchanged words before the defendant drove away in his truck. Mr. Walker also testified that the defendant did not appear to have any trouble talking, walking, or driving his truck away from the tavern. He said that the defendant lived approximately three miles away.

Mr. Walker testified that after the defendant drove away, he went inside the tavern and told Mr. Williams of the threat the defendant had made. Mr. Walker said that although he tried to convince him to leave, Mr. Williams stayed at the tavern. Mr. Walker said that approximately twenty to thirty minutes later, he heard a gunshot while he was sitting at a pool table. He stated that he then saw the defendant standing in the doorway with a shotgun. He said that the defendant had blood dripping down one side of his face. Mr. Walker testified that the defendant then fired a second shot. He stated that he went out the back door and around the building to look for the defendant. He said that he saw the defendant near an outside corner of the tavern and that he tried to calm the defendant. Mr. Walker testified that the defendant pointed the shotgun at him,

9

but when the defendant's attention was disturbed by someone else, he grabbed the shotgun from the defendant. Mr. Walker stated that the gun was a single-shot shotgun and a single live shell was in the chamber.

On cross-examination, Mr. Walker testified that after he took the shotgun away from the defendant, the defendant told him that there was no reason for him to be treated the way he had been treated in the tavern. Mr. Walker said that he interpreted the defendant's statement as meaning that the defendant should not have been embarrassed in that manner.

Herschell Jackson, a patron of the Next Door Tavern, testified that he was an acquaintance of the defendant but that he also knew Kevin Williams and Jack Speakman very well. He said that he observed the defendant and Mr. Williams arm wrestling from the other end of the bar. He said that he then saw several people walking towards the door yelling at each other. He said that the defendant then left the bar.

Mr. Jackson testified that after about an hour, he heard what sounded like someone kicking the door open and then a gunshot. He said that he looked towards the door and saw the defendant standing there with a shotgun. Mr. Jackson stated that he moved toward the door and tried to close it, but the defendant fired at least one more shot through the door. He testified that after the shooting stopped, he saw Keith Walker come through the back door of the tavern with a shotgun.

Deputy Sheriff Roy Briscoe testified that he responded to a 911 call at 12:32 a.m. regarding an accident involving the defendant's truck on the Old Clarksville Highway approximately seven-tenths of a mile from the Next Door Tavern. He said that it appeared that the defendant's truck had run off the road, hit a barn, and turned end-

10

over-end, landing in the yard of a residence. He stated that he did not observe any skid marks. Deputy Briscoe stated that the driver of the truck was not at the scene and there were no eyewitnesses to the accident. Deputy Briscoe testified that while investigating the accident scene, he overheard a radio call to Metro Police to respond to a shooting at the Next Door Tavern. He said that he later received information that the defendant had been arrested in relation to the shooting, and he stated that he then asked Metro Police to draw a blood sample from the defendant. Deputy Briscoe testified that he believed that the defendant was driving under the influence of an intoxicant because there were numerous alcoholic beverage containers inside and outside the defendant's truck.

Michael Hooper, an emergency medical technician, testified that at 12:47 a.m., he and his partner responded to a call regarding a shooting at the Next Door Tavern. He said that as he was driving the ambulance down Clarksville Highway looking for the tavern, he saw the defendant staggering in the middle of the highway. He stated that when he asked the defendant what was wrong, the defendant said that he had wrecked his truck. He stated that the defendant had cuts and blood on his face. Mr. Hooper testified that he then saw another person approaching them, and by the time they put the defendant in the back of the ambulance the other person had reached the ambulance and told them about the shooting. Mr. Hooper said that they then went to the tavern.

On cross-examination, Mr. Hooper explained that when he first saw the defendant, the defendant was having a lot of difficulty walking and was not walking in a straight line. He testified that the defendant's injuries were consistent with those that would result from an automobile accident. After reviewing photographs of the defendant's wrecked truck, Mr. Hooper said that he would have expected the defendant to have been killed or severely injured and would not have expected him to be able to

11

get up and walk around. He also testified that the defendant appeared confused and had a loss of equilibrium, although he did not know whether the defendant was suffering from shock. He stated that he believed that the defendant "could certainly understand" what the medical personnel were saying to the defendant. Mr. Hooper explained that the the defendant's difficulty in walking and talking could have been caused by injuries sustained in the wreck or by being struck during a fight. He said that he was unsure whether the defendant had experienced a loss of consciousness. Mr. Hooper believed that the defendant was intoxicated.

Officer William McCall of the Metro Police Department testified that he responded to a call at 12:51 a.m and that he was the first officer to arrive at the Next Door Tavern after the shooting. He said that he found the defendant in the back of the ambulance. He stated that the medical personnel were trying to administer treatment to the defendant, but the defendant was refusing treatment. Officer McCall explained that the defendant tried to get up and leave on two different occasions. He stated that the defendant told him that he had been in a fight. Officer McCall testified that the defendant did not slur his speech but rather the defendant appeared coherent and seemed to understand his questions. He said that the defendant smelled like alcohol, although he did not believe the defendant was drunk. Officer McCall also identified the single-action shotgun that Herschell Jackson gave to him during his investigation at the tavern.

Officer Christine Woods of the Metro Police Department was the second officer to arrive at the Next Door Tavern after the shooting. She said that when she asked the defendant whether he had shot anyone on two occasions, the defendant responded each time by telling her that he had been involved in a wreck. She interpreted the defendant's statements as an indication that he did not want to talk about the shooting. She testified that in her opinion, the defendant was intoxicated but

12

not disorientated or confused.  She said that the defendant seemed to understand what was happening around him.  Officer Woods conceded that she described the defendant as being very intoxicated in her report.

Officer Thomas Simpkins of the Metro Police Department identified evidence found at the tavern.  He said that he found two spent shotgun shells and one live shell outside the tavern, and he found two shotgun shell waddings inside the tavern.

Detective David Miller of the Metro Police Department assisted Detective Al Gray in the investigation.  He testified that on the night of the murder, he interviewed the defendant at the hospital.  Detective Miller said that the defendant appeared to have been drinking, but that during the interview, the defendant did not slur his speech, appeared coherent, and seemed capable of understanding what was going on around him.  He said that the defendant gave specific answers to his questions.  He testified that the defendant told him during the interview that he had been in a fight after an arm wrestling match and that he was trying to get away when he wrecked his truck.  Detective Miller said that he requested that a blood sample be drawn from the defendant after receiving a request from Deputy Briscoe for purposes of Briscoe's investigation of the defendant for driving under the influence.

Detective Alfred Gray, III, of the Metro Police Department testified that he interviewed the defendant at approximately 4:00 a.m., three to three and a half hours after the shooting.  He said that the defendant appeared to understand when he read him his constitutional rights.  He also said that the defendant did not appear to be intoxicated.  He said that he learned during his investigation that the defendant had obtained the shotgun from his home.  Detective Gray testified that he investigated the

13

loss of the defendant's blood sample but was not able to determine what happened to the sample.

Dr. Edmund Rutherford, the trauma surgeon that treated Gary Dean Harris, testified that a shotgun wound can be life threatening if made at close range, even if the shotgun pellets traveled through a door. He also testified that despite Mr. Harris' blood alcohol content being .286 the night of the shooting, he found that Harris was alert and coherent. He said that the degree of impairment for a specific blood alcohol content would be greater for persons who did not chronically use alcohol.

Dr. Julia Goodin, the Davidson County Medical Examiner, testified that Dan Newland received one shotgun wound injury to the left arm and upper chest and that the wounds resulted in his death. She testified that the shotgun was fired from a distance of between eight to twenty feet. Dr. Goodin also testified that Dan Newland had a blood alcohol content of .31.

The defendant's first witness was Beverly Hunter, the defendant's cousin. She testified that she, the defendant, Gary Dean Harris, and one other person were at the VFW drinking the afternoon before the shooting. She testified that she believed that the defendant was drunk because he spilled his drink at the VFW. She said that after two or three hours of drinking they went to another bar for about an hour. She said that they then went to the Next Door Tavern. Ms. Hunter testified that she was using the pay telephone on the outside wall near the Next Door Tavern door when she saw the defendant leave the tavern followed by Jack Speakman and another person. On cross-examination, she testified that she did not notice any arguing or yelling between the defendant and anyone else. Ms. Hunter conceded that she drank a lot that night. She described the defendant as being drunk, but not "falling down drunk."

14

She said that the defendant was coherent, was able to carry on a conversation, and did not stumble or fall.

The defendant's second witness was William King, owner of the house where the defendant wrecked his truck. He testified that he noticed a small truck in his yard on the night of the offense. He said that he looked for an injured driver, found none, and went inside to call the sheriff.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is not sufficient to support his conviction for felony murder.[1] He asserts that the evidence, at most, can only support a conviction for voluntary manslaughter. The defendant argues that there was no evidence to establish deliberation or premeditation as required for the underlying felony of attempted first degree murder. Rather, the defendant argues that the evidence instead showed that the killing was committed in a state of passion produced by adequate provocation because he was intoxicated, had been involved in a fight, and had been involved in an automobile accident. The state responds that the evidence is sufficient. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.

---

[1] The defendant concedes that the evidence is sufficient to support his aggravated assault conviction.

1978). Under this standard, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. Cabbage, 571 S.W.2d at 835. That is, the testimony favoring the state is accredited and all conflicts are resolved in favor of the state's theory. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

In the light most favorable to the state, the evidence shows that the defendant was arm wrestling with Kevin Williams when he became angry and accused Williams of cheating after the defendant lost the first match. The defendant then slammed Williams' hand on the table, grabbed the money which was bet on the match, and started to walk away. Jack Speakman then grabbed the defendant, and they fell to the floor. Once Speakman released the defendant, the defendant walked out of the tavern, threatening to get a gun and return to kill everyone in the bar. After walking out of the tavern, the defendant told Keith Walker a couple of times that he was going to get a gun and kill Speakman and Williams. Speakman yelled at the defendant, and the defendant cursed and yelled at Speakman that he would be back to kill him. The defendant then drove home and got his shotgun, but he wrecked his truck as he returned to the tavern. The defendant then got out of his truck, taking his shotgun and walking approximately seven-tenths of a mile to the tavern.

When the defendant returned to the tavern about twenty to thirty minutes after initially leaving, the defendant kicked open the tavern door and fired once into the tavern, shooting and killing Dan Newland. The defendant then removed the empty shell, placed another live shell in the chamber, and fired a second time through the tavern door. From this evidence, the jury was entitled to conclude that the defendant recklessly killed Newland while acting with premeditation and deliberation in attempting to kill Williams, carrying out his actions with a cool purpose. See T.C.A. § 39-13-201(b)(1)-(2) (1991). We believe that this evidence establishes beyond a reasonable

16

doubt that the defendant recklessly killed Dan Newland during the attempted murder of Williams. See T.C.A. § 39-13-202(a)(2) (1991).

## II. FAILURE TO PRESERVE EXCULPATORY EVIDENCE

The defendant contends that the trial court erred by denying his motion to dismiss the indictment because the state failed to preserve a blood sample taken from him on the evening of the shooting. The defendant asserts that the state's suppression of the evidence violated his due process rights under Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). He argues that he was precluded from offering scientific evidence that would have most likely established that he was intoxicated at the time of the offense. The defendant concedes that the proof does not show that the state deliberately destroyed the blood sample. However, he argues that good or bad faith on the part of the state is irrelevant under Brady because the blood sample constitutes exculpatory evidence in that it would be relevant to negate the culpable mental state required for the underlying felony of first degree murder, a specific intent crime. See T.C.A. § 39-11-503(a). The defendant complains that had the defendant had access to the blood sample at trial, the jury would have returned a verdict of voluntary manslaughter or, at most, second degree murder.

In response, the state contends that the trial court properly denied the defendant's motion to dismiss. It argues that the defendant has failed to establish either that the evidence was exculpatory or that the state acted in bad faith, citing Arizona v. Youngblood, 488 U.S. 55, 57-58, 109 S. Ct. 333, 337 (1988). The state concedes that evidence of the defendant's intoxication would have been relevant to negate the specific intent required for the charges of first degree premeditated and deliberate murder and aggravated assault and for attempted first degree murder, the underlying felony for the felony murder charge. However, the state asserts that the evidence is not exculpatory because the blood sample would have, at best, shown that

17

the defendant's blood alcohol level was above the legal limit, and such evidence would not have negated the requisite culpable mental state required for the specific intent crimes for which the defendant was charged because proof of intoxication alone is not a defense to a specific intent crime. The state argues that proving the blood alcohol level of the defendant at the time of the killing would not be sufficient to negate the requisite specific intent absent evidence that the defendant's intoxication deprived him of the mental capacity to form the specific intent required for the offenses charged.

Before trial, the defendant filed a motion to dismiss the indictment for the failure to preserve material evidence. At a hearing on the defendant's motion, Detective Miller from the Metro Police Department testified that on February 1, 1993, Deputy Briscoe asked that Miller have a blood sample drawn from the defendant. Detective Miller said that drawing blood was not normally done in homicide cases but that Deputy Briscoe needed a blood sample for his investigation of the defendant for driving under the influence with respect to the truck accident. After he received the blood sample from the hospital, Detective Miller said that he gave the sample to Detective Gray who was in charge of investigating the shooting. Detective Gray testified that he did not remember receiving the blood sample from Detective Miller but that he remembered finding the blood sample in the homicide section refrigerator and taking it down to the property room in July 1993.

Officer Joy Moore of the Metro Police Department Property Room testified as to the handling of blood samples. She testified that according to her records a blood alcohol kit containing the defendant's blood sample was delivered to the property room on July 14, 1993, by Detective Gray. She said that her records show that the blood sample was logged in, and she stated that the normal procedure would be to place the sample in the cooler until it could be transported to the T.B.I. Crime Laboratory. Officer

18

Moore testified that her records show that she transported the defendant's blood sample to the T.B.I. lab on July 27, 1993, and gave it to Mildred Krice at the crime lab.

Mildred Krice, an evidence technician at the T.B.I. Crime Laboratory, testified that her records show that the lab never received the defendant's blood sample. She said that samples are delivered in a sealed box with an evidence submittal form inside the sealed box. She stated that when she receives a blood sample, she opens the sealed box, verifies that the blood sample is identified as shown on the evidence submittal form, enters the data into the computer, and finally attaches a T.B.I. Crime Laboratory label to the sample. She said that if the form is missing or the sample identification does not match the form information her procedure is to notify the delivering agency so that they can correct it.

Terry Fields of the T.B.I. Forensic Division testified that blood alcohol analysis is generally conducted in approximately one week from its arrival at the lab. He said that blood samples that have been through the proper chain of custody requirements may be tested and render accurate results quite a long time, possibly years, after the blood sample is taken. He stated that informal studies have shown that accurate results are achieved even when testing a blood sample that has been opened three or four times approximately four to six months after testing. On cross-examination, Mr. Fields conceded that a person's intoxication level alone does not determine whether he or she is able to function or think clearly or is able to form the intent required to commit murder.

At the conclusion of the hearing on the defendant's motion to dismiss the indictment, the trial court denied the motion. The trial court ruled that the state did not act in bad faith but rather the state's loss of the blood sample was a result of carelessness.

In Brady, the United States Supreme Court held that the prosecution has a compelling duty to furnish the accused any evidence that is favorable to the accused and material to his guilt or punishment. 373 U.S. at 87, 83 S. Ct. at 1196-97; see also State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992). The Court ruled that good faith or bad faith on the part of the state is irrelevant when the state fails to disclose to the defendant materially exculpatory evidence. Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). The Supreme Court further stated that the

> touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995) (citations omitted); see also State v. Edgin, 902 S.W.2d 387, 390-91 (Tenn. 1995).

Initially, we note that the blood sample does not constitute materially exculpatory evidence under Brady. Rather, the evidence merely "could have been subjected to tests, the results of which might have exonerated the defendant." See Youngblood, 488 U.S. 51, 57, 109 S. Ct. at 337. The defendant's argument that he was prevented from presenting "scientific evidence that would have, in all likelihood, established that he was . . . intoxicated at the time of the offense" essentially concedes that the exculpatory nature of the blood sample is unknown. (Emphasis added). We believe that the blood sample falls within the class of "potentially exculpatory evidence" as set forth in Youngblood. See id.

20

In Youngblood, the Supreme Court held that the failure of the prosecution to preserve evidence which is potentially useful to the defendant may constitute a denial of due process of law, if the defendant can show bad faith on the part of the police. 488 U.S. at 58, 109 S. Ct. at 337. In a concurring opinion, Justice Stevens questioned such a broad statement regarding bad faith, indicating that even if a defendant cannot prove bad faith, there may be cases in which the loss or destruction of evidence is so critical as to make further prosecution fundamentally unfair. 488 U.S. at 61, 109 S. Ct. at 339. In a dissenting opinion authored by Justice Blackmun, three members of the Court stated that reliance upon a good faith/bad faith standard as dispositive was inappropriate and opted to focus the inquiry on the materiality of the evidence, its potential to exculpate, and the existence of other evidence on the same point of contention. 488 U.S. at 67-70, 109 S. Ct. 343-43.

This court has followed the majority opinion in Youngblood. State v. Eldridge, 951 S.W.2d 775, 778 (Tenn. Crim. App. 1997); State v. Jefferson, 938 S.W.2d 1, 16 (Tenn. Crim. App. 1996); Robert Lloyd Wiggins v. State, No. 03C01-9605-CC-00191, McMinn County, slip op. at 31 (Tenn. Crim. App. Mar. 20, 1997), app. denied (Tenn. Sept. 29, 1997); State v. Jerry Douglas Franklin, No. 01C01-9510-CR-00348, Davidson County, slip op. at 8 (Tenn. Crim. App. Feb. 28, 1997), app. denied (Tenn. Nov. 17, 1997); but see Stave v. Marvin K. Ferguson, No. 03C01-9406-CR-00235, Washington County (Tenn. Crim. App. July 17, 1997), applic. filed (Tenn. Aug. 3, 1997) (in separate opinions, majority of panel indicate that Youngblood majority opinion does not meet all due process concerns under the state constitution).[2] Under Youngblood, the defendant is not entitled to relief. He concedes that the record does not reflect that the state deliberately destroyed the blood sample, and we believe that the record supports the trial court's conclusion that the state acted carelessly, and not

---

[2] We note that the majority of the states that have considered Youngblood in relation to their state constitutions have rejected the majority opinion. See, e.g., State v. Morales, 657 A.2d 585, 594-95 (Conn. 1995) (listing states and noting that only Arizona and California had, at that time, agreed with Youngblood).

21

in bad faith.  Thus, we conclude that the state's failure to preserve the blood sample did not violate the defendant's due process rights.

### III.  VINDICTIVE PROSECUTION

The defendant contends that his felony murder conviction should be set aside because the conviction was obtained in violation of his due process rights by retrying him under a theory of first degree murder that was not asserted in his first trial that resulted in a mistrial.  He argues that retrial upon the same facts presented in the first trial but under a different legal theory was patently and fundamentally unfair. Though he concedes that a retrial itself does not violate traditional notions of fairness, see Arizona v. Washington, 434 U.S. 497, 505, 98 S. Ct. 824, 830 (1978), the defendant argues that it was fundamentally unfair for the state to benefit from the defendant having successfully defended himself in the first trial.  The defendant also asserts that his felony murder conviction must be set aside because the trial court in the first trial properly determined that the state had not sufficiently proven an element essential to the defendant's conviction for felony murder on retrial as evidenced by the trial court's refusal to instruct the jury on transferred intent.  The state responds that the trial court properly denied the defendant's motion to dismiss because the defendant's due process rights were not violated.  The state argues that not only was it permitted to retry the defendant for first degree murder, but it was also allowed to rely upon a different theory upon retrial.

The defendant was first indicted on April 27, 1993.  A three-count indictment charged the defendant with the first degree premeditated and deliberate murder of Danny Newland, the attempted first degree premeditated and deliberate murder of Gary Harris, and the aggravated assault of Gary Harris.  A trial was conducted, resulting in a mistrial.  A second indictment was obtained on December 7, 1993, purporting to charge the defendant in separate counts with first degree

22

premeditated and deliberate murder and felony murder during the perpetration or attempted perpetration of assault with intent to commit murder. The third count of the indictment charged the defendant with attempted first degree murder of Harris.

Before trial, the defendant filed a motion to dismiss the felony murder count of the indictment because it violated his due process rights. A hearing was held on the motion. At the hearing, Billy Harrell, the foreperson of the defendant's first trial that resulted in a mistrial, testified that the jurors could not decide between second degree murder and voluntary manslaughter. He said that ten of the jurors voted for second degree murder, one voted for voluntary manslaughter, and one was undecided.

At the conclusion of the hearing, the defendant argued that a dismissal was required because the trial court had ruled at the first trial that there was insufficient evidence to instruct on transferred intent and thus it would be unfair to require the defendant to defend against felony murder in the perpetration of an attempted first degree murder on retrial. After hearing argument by counsel, the trial court stated that it recalled that there was not much disagreement at the first trial that the evidence did not support transferred intent because Speakman was not present in the tavern when the shooting took place. The trial court held that its earlier decision denying a transferred intent instruction had no bearing on the trial court's decision regarding felony murder, stating that transferred intent applied to intentional killings but not to felony murder. Ultimately, the trial court denied the defendant's motion, ruling that the defendant's due process rights were not violated and the state was not foreclosed from pursuing a felony murder theory on retrial. However, the trial court dismissed the felony murder count, holding that it was defective because assault with intent to commit murder is not listed as an underlying felony for felony murder.

The defendant was indicted again on January 14, 1994. The indictment alleged in separate counts (1) first degree premeditated and deliberate murder, (2) first degree felony murder during the perpetration of an attempted first degree murder, (3) attempted first degree premeditated and deliberate murder, and (4) aggravated assault. The defendant was tried and convicted of the offenses of felony murder and aggravated assault.

In support of his argument, the defendant relies upon State v. Carter, 890 S.W.2d 449 (Tenn. Crim. App. 1994). In Carter, this court held that fundamental fairness bars the state from asserting on retrial aggravating factors not relied upon by the state at the first trial. Id. at 454. However, the Tennessee Supreme Court held to the contrary in State v. Harris, 919 S.W.2d 323, 330 (Tenn. 1996) ("the State is free, at resentencing to introduce proof of any aggravating circumstance which is otherwise legally valid.").

The defendant cites North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. at 2972 (1977), in support of his argument. In Pearce, the United States Supreme Court concluded that the defendant's due process rights were violated when the government retried the defendant for charges that had been successfully appealed and the trial court imposed greater sentences without providing reasons for the enhancement. Id. at 726, 89 S. Ct. at 2081. The Court stated that a trial court must set forth its reasons for imposing a more severe sentence to insure that vindictiveness does not deter a defendant from exercising his right to appeal. Id. at 725-26, 89 S. Ct. at 2080-81. The defendant also likens his case to United States v. Lee, 435 F. Supp. 974 (E.D. Tenn. 1976). In Lee, a federal district court held that the defendant's due process rights were violated by being retried for greater felony charges when the defendant had successfully appealed misdemeanor convictions relating to the same criminal conduct and the government had not shown either that it was impossible to proceed on the

24

more serious charges at the first trial or that the government did not learn of the new evidence through no fault of its own. Id. at 978-79. Although the defendant concedes that felony murder is not a greater charge, he argues that the reasoning in Lee applies nonetheless. We disagree.

In this case, the defendant was not subjected to a greater sentence on retrial nor was he charged with a greater offense. Our criminal code prohibits the offense of first degree murder, although it lists several means by which the offense may be committed. See T.C.A. § 39-13-202 (1991). Regardless of which theory is relied upon by the state, the offense committed by the defendant is the same, first degree murder. See State v. Hurley, 876 S.W.2d 57, 59-60 (Tenn. 1993). Thus, the fact that the state changed its theory of how the defendant committed the offense does not indicate any vindictiveness or retaliation for the defendant's exercise of constitutional or statutory rights, particularly when the state notified him by the indictment as to the change.

As for the defendant's claim that implicit in the trial court's refusal to instruct on transferred intent in the first trial is that the trial court found that the state failed to prove that the defendant intended to kill someone other than Newland, we disagree. We note that the record on appeal does not include a transcript of the proceedings that took place at the first trial. It is the duty of the appealing party to prepare a fair, accurate and complete record on appeal to enable meaningful appellate review. T.R.A.P. 24(b). When necessary parts of the record are not included, we presume that the trial court's ruling was correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

In any event, the defendant is not entitled to relief. The record before us does not reflect that the defendant was acquitted of the charges of first degree murder.

25

To the contrary, the evidence shows that the first trial resulted in a mistrial. Also, we do not believe that the trial court intended that its ruling on the state's request for an instruction on transferred intent be considered an acquittal or a determination that the state had failed to establish the elements of the offense of first degree premeditated and deliberate murder. Therefore, we hold that retrying the defendant upon a felony murder theory of first degree murder was not fundamentally unfair and did not violate the defendant's due process rights.

## IV. BATSON CLAIM

Finally, the defendant contends that his constitutional rights were violated when the state exercised a peremptory challenge against the only black potential juror questioned during voir dire. He argues that he established a prima facie case of racial discrimination and that the state failed to prove a racially-neutral reason for challenging the juror. The state counters that the defendant failed to establish a prima facie case of racial discrimination because striking the only black person questioned on voir dire is not sufficient to raise the inference of purposeful discrimination. The state also contends that it did provide a race-neutral reason for the challenge.

The record[3] reflects that Kenneth Gregory, a prospective juror, was questioned during voir dire regarding his occupation, marital status, whether he knew anyone who had been a victim of crime or who had a problem with alcohol at work. Mr. Gregory stated that he had seen how alcohol affects a person's mental state and how it can cause a person to do something that he would not have expected. He said that he could be fair and follow the trial court's instructions. After the voir dire of the jury, Mr. Gregory was excused by the trial court upon the state's challenge. A hearing was then conducted in the trial court's chambers, and the defendant objected to the removal of Mr. Gregory:

---

[3] The record includes only the transcribed portion of the voir dire of Kenneth Gregory, a prospective juror. The defendant did not request that the entire voir dire proceedings be transcribed.

[DEFENSE COUNSEL]: I would make a <u>Batson</u> Motion concerning the juror the State has struck, Kenneth Gregory. I don't feel that there was any basis for striking this juror. He is an African American male. I don't feel that there is any basis to excuse him. He is single, and has worked ten years for Kroger's and that sort of thing. I don't believe that he gave any answers to require that the State strike him. He is the only black seated on the Jury at this time.

COURT: [Prosecutor], do you care to respond to that?

PROSECUTOR: Well, Judge, I understand that, first of all, that the defendant is white. I don't think that the State striking one black male makes this a basis for a <u>Batson</u> Motion. At the time Mr. Gregory was excused, Mr. Dotson, a white male was also excused. On the basis of that, I don't believe that he can raise a <u>Batson</u> issue. I don't believe that excusing one black juror shows a pattern. The reason I challenged Mr. Gregory was because I felt like he was making faces at some of the questions we were asking. There was just something about his body language that made me feel very uncomfortable. I just felt like he was not taking this seriously. I just got a feeling about him, and that's the reason I challenged him, not because he is black.

COURT: [Defense Counsel], I will note that Mr. Gregory is not the only black juror on this panel of prospective jurors that are here. I will accept [the prosecutor's] response as to why he challenged this juror. You challenged a white juror. I don't believe there was any racial basis for his excusing this juror, so I will overrule you objection.

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986), the United States Supreme Court held that a state's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates the defendant's Fourteenth Amendment right to equal protection. The Court upheld this principle in <u>Powers v. Ohio</u>, 499 U.S. 400, 111 S. Ct. 1364 (1991), but eliminated the requirement that the defendant and the potential juror share the same race. The Court held that race was "irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." <u>Id</u>. at 416, 111 S. Ct. at 1373.

A defendant seeking to raise a <u>Batson</u> claim has the initial burden of making a <u>prima</u> <u>facie</u> showing of purposeful discrimination against a prospective juror. <u>Batson</u> 476 U.S. at 93-94, 106 S. Ct. at 1721; <u>State v. Ellison</u>, 841 S.W.2d 824, 826

(Tenn. 1992).  Our supreme court recently reiterated the guidelines set forth in Batson for making out a prima facie case of purposeful discrimination:

> Defendant "may make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  This showing may include proof of systematic exclusion, substantial underrepresentation on the venire, or the selection methods and results solely in the present case.  As to the purposeful requirement, defendant is entitled to rely on the nature of the peremptory challenge --that it permits "'those to discriminate who are of a mind to discriminate.'"  In the end, defendant must establish that a consideration of all the relevant circumstances raises an inference of purposeful discrimination.

Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 902-03 (Tenn. 1996) (citations omitted).  Standing alone, the fact that the state challenged the only potential black juror on the panel does not establish a prima facie showing of purposeful discrimination.  State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995).

Once the defendant establishes a prima facie showing of purposeful discrimination, the burden shifts to the state to articulate a racially-neutral reason for the challenge.  Batson, 476 U.S. at 97, 106 S. Ct. at 1723.  The state's explanation "must be based on more than stereotypical assumptions, but it need not rise to the level required to justify the exercise of a challenge for cause."  State v. Ellison 841 S.W.2d 824, 826 (Tenn. 1992); Batson, 476 U.S. at 97, 106 S. Ct. at 1723.

In ruling on an objection to the discriminatory use of a peremptory challenge, the trial court is obligated to articulate specific reasons for each of its factual findings.  Woodson, 916 S.W.2d at 906.  First, the court should explain why the objecting party has or has not established a prima facie showing of purposeful discrimination.  Then, if the defendant has made a prima facie showing, the court must determine whether the state gave a race-neutral explanation for the challenge and whether it finds, based on the totality of the circumstances, that the challenge was the result of purposeful discrimination.  Id.  "The trial court's factual findings are imperative

28

in this context.  On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous."  Id.

In this case, the trial court did not explicitly state whether the defendant made a prima facie showing of discrimination.  Based on the scant record before us, we cannot tell whether the defendant met this initial burden.  When faced with a similarly cryptic record in Woodson, our supreme court concluded that the trial court had found that the objecting party made a prima facie showing of purposeful discrimination.  The court reasoned that if the objecting party had not made a prima facie showing, then the trial court would not have required an explanation for the challenge.

In any event, the trial court in this case concluded that the state did not challenge the prospective juror based on his race.  The court accredited the prosecuting attorney's response that he challenged the juror based on the juror's body language and based on the prosecuting attorney's perception that the juror was not taking voir dire seriously.  Based on the record before us, we cannot say that this finding is clearly erroneous.

In consideration of the foregoing and the record as a whole, we affirm the trial court's judgment of conviction for first degree murder and for aggravated assault.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
David G. Hayes, Judge


_____
Jerry Scott, Special Judge