BACKGROUND
EAGAN, Judge.
A. The Administrative Proceeding
The plaintiff brought the present action challenging the revocation of his gaming license for his alleged theft of $2,000.00 jackpot from a Kiosk machine in the Mo hegan Sun Casino, where plaintiff was em - ployed as a Slot Floor Supervisor. It is undisputed that at approximately 1:30 a.m. on April 19, 2005, plaintiff was assisting a Slot Attendant to pay a $2,000.00 jackpot to a patron. Both the plaintiff and the Slot Attendant proceeded to Kiosk [1] # 30. where they attempted to process the jackpot. The Kiosk produced a payout slip for $2,000.00, but dispensed no cash. The plaintiff noted this on a transaction slip and proceeded to a cashier window where he obtained the $2,000.00 jackpot which was then paid to the patron.
Thereafter, the plaintiff returned to Kiosk # 30, where he noticed that an icon which controls the dispensing of money was missing from the computer screen. *607 At that point, the Kiosk dispensed $2,000.00. According to the plaintiff, he followed protocol and returned the $2,000.00 to the Kiosk via a drop slot. The $2,000.00 was not recovered from the Kiosk, according to the defendant, who contends that plaintiff took the money for his own use. After Kiosk # 30 dispensed the cash, the plaintiff took advantage of the “early out” program, which allowed him to leave before the end of his shift and which, according to a witness for the defendant, the plaintiff had taken before. Administrative Transcript, p. 27.
Following an evidentiary hearing, at which the plaintiff represented himself pro se, the Hearing Officer made the following Findings of Fact:
“1. Mr. Culley received the May 11, 2005 letter notifying him of the Show Cause Hearing (Exhibit # 1).
2. Testimony by Nancy Ducheneau, Variance Specialist for Mohegan Sun indicated that the casino initially believed there wras a missing document to cover the $2,000 jackpot from Kiosk # 30.
3. When questioned about Exhibit # 2, Ms. Ducheneau stated the third entry with a dispense total of $2,000, indicates that the jackpot was paid from Kiosk # 30. Had it not been paid, this document, according to her testimony, would have a “void” entered along with an error code.
4. She also stated mechanics went to the machine and checked for the missing money twice without success.
5. Lorraine Nevins, Director of Slot Operations testified about the process used to pay a jackpot from any Kiosk. In her testimony, she noted Exhibit # 4 is the ticket generated by Kiosk # 30. It, produced a W2G (for winnings above $1,200) and a jackpot slip. But because the Kiosk # 30 did not dispense the 82,000, employees annotated it and took it to a coin redemption window'. Exhibit # 7 is generated from the coin window and gives the employee the money to pay the jackpot. The payment is made by two employees to the patron.
6. At this point, per Exhibit # 9, Ryan Culley returned to the Kiosk to close out the jackpot entry. lie noticed an icon was missing from the computer screen. This icon, referred to as a “TDN” icon, controls the dispensing of the money for jackpots from the Kiosks. He put the icon back on the screen without re-booting the Kiosk computer. When this wras done, $2,000 was paid out by the Kiosk for the jackpot earlier paid by going to the window.
7. Mr. Gulley’s statement claims he counted out the money and used a drop bag (Exhibit # 8) to put the cash in and then deposit it into the Kiosk.
8. An earlier statement by Nancy Du-cheneau stated the mechanics checked the Kiosk twice for any money and found none.
9. Mr. Culley testified that he did take the $2,000 from the Kiosk,
10. In addition to the activity described by Mr. Culley, it was noted that the jackpot VOID (Exhibit #4) occurred at 0132 hours on the date in question. The jackpot "OVERRIDE” occurred at 0138 hours followed by the Kiosk payment (Exhibit # 2) at 0156 hours. Mr. Culley departed for his break at approximately 0200 hours (Exhibit # 9). At 0240 hours, Mr. Culley annotated the Kiosk Entry Authorization Log (Exhibit # 10) with “OK TDN DISPLAYED ON SCREEN.” At approximately 0300 hours, Mr. Culley took an early out, which allows an employee to go home prior to shift completion (Exhibit # 9).
11. From Ms. Nevins’ testimony, she stated it is usual for a Floor Manager to begin the shift by checking the opera *608 tional status of Kiosks. The operational status is entered in the Kiosk Entry Authorization Log (Exhibit # 10).
12. Mr. Gulley stated that he placed the $2,000 in the Kiosk deposit slot. Exhibit # 6 indicates that when Kiosk # 30 was inventoried, it was found to have two jackpot payout slips and one VOID slip. There was no deposit of $2,000 as Mr. Gulley indicated.
13. Based on testimony, I find that it is more probable than not that Mr. Culley took the $2,000 jackpot for his own use. I give weight to the fact that he took an early out during this shift as it further leads to the belief that he wanted to leave the casino so that the jackpot could not be found on him. I also give weight to the fact that Mr. Culley’s inspection of the Kiosk prior to leaving raises suspicion as to his intent on performing the inspection. This is unusual to cheek a machine upon conclusion of a shift. Perhaps he wanted to verify that nothing in the Kiosk would lead back to him.
14. I am revoking Mr. Culley’s gaming license for his theft of the $2,000 jackpot.”
B. Plaintiffs Request to Provide Additional Evidence on Appeal
Following the administrative decision revoking his gaming license, the plaintiff retained counsel who, as a part of the appellate process, asked this Court to hear additional testimony with regard to the existence of surveillance coverage at the time Kiosk #30 dispensed the $2,000.00 cash. The plaintiffs proffer was that the Casino had video camera surveillance of all the Kiosks, including Kiosk # 30, at the time of the alleged theft, which surveillance tape was not made available to the plaintiff and could have exonerated him.
During the course of the administrative hearing, the only testimony regarding surveillance coverage of Kiosk # 30 was by Lorainne Nevins, Director of Slot Operations for the Casino, who had investigated the incident. She testified that “Now, as soon as we, as soon as I heard that it was currency that we were looking for we immediately called Surveillance, they were not able to help us.” Administrative Record, p. When asked whether her investigation concluded that plaintiff had stolen th<-$2,000.00 dispensed from Kiosk #30, Ms. Nevins responded:
“Well, I did not have the advantage of Surveillance coverage on this. II' 1 would have had the advantage of Sur veillance coverage, there would have been no question as to what happened. I don’t know what happened.” [Emphasis supplied]. Administrative Record, p. 32.
Consequently, on March 23, 2006, pursuant, to MTO 2002-13, Section 3(1)[2], the Court permitted the plaintiff to present additional testimony from Lorainne Nevins and Nancy Ducheneau, Variance Specialist employed by the Mohegan Sun Coin Department, who had testified at the administrative hearing, as well as from the plaintiff.
C. MTO 2002-13, Section 3(1) Evidence
The evidence presented on appeal conclusively established that in the high limit slots area of the Casino there is a fixed camera on each Kiosk which is digitally recording twenty-four hours a day, seven days a week. Unless the Surveillance Department receives a request for surveillance footage, it is retained for only 7 days.
*609 During the 7 day period during which : surveillance footage is retained, Ms. I)u-■L'cheneau asked the Surveillance Department to review the surveillance footage for ⅞"Kiosk #30 and was told that they were not able to help her[3]. At the time Ms. Ducheneau made her request to the Surveillance Department, she believed the problem concerned a missing transaction slip for the $2,000.00, not a cash shortage. Later, when Ms. Nevins’ department help'came involved and the focus of the invest i-⅜ .gation had shifted from missing paper to missing currency, her department again contacted Surveillance. According to Ms. Nevins testimony: “Well, when we discovered that it was actually funds that were ⅞/missing, not a transaction slip, we immedi-^■Vately contacted Surveillance and asked them to review the tape and at that time I was told that because it was past the seven days that it was not available.” Transcript of March 23, 2006 Hearing, p. 44.
This Court finds that with regard to Kiosk # 30, all the events occurring there ¿during the relevant time frame when the $2,000.00 was dispensed, were digitally recorded by a surveillance camera.[4]

STAXDARD OF REVIEW

The standard of review of an agency’s final decision in an appeal filed pursuant to MTO 2002-13, section 3(j)-(k) is substantially similar to that under the Connecticut Administrative Procedures Act, C.G.S. Section 4-183(j). LaPietra v. Office of the Director of Regulation, 1 G.D.R. 126, 127, 4 Am. Tribal Law 535, 537-38, 2003 WL 25796262 (2003). “If the administrative record provides substantial evidence upon which the hearing officer could reasonably have based his finding, the decision must be upheld.” Id. The court is not permitted to substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. MTO 2002-13 Section 3(j). Kochachy v. Office of the Director of Regulations, 1 G.D.R. 115, 116, 4 Am. Tribal Law 522, 523-24, 2003 WL 25795195 (April 2003).
Nevertheless, the court may not affirm an administrative decision if substantial rights of the plaintiff have been prejudiced. Id. Moreover, gaming licenses cannot be revoked without a hearing that comports with procedural due process, as required by the Due Process Clause in the Indian Civil Rights Act of 1968, 25 USC. Section 1302, which the Constitution of the Mohegan Tribe, Article XI, Section 1, recognizes as a limitation on its powers; and as also adopted in the Constitution of the Mohegan Tribe, Article XI, Section 1(h). Pineiro v. Office of the Director of Regulation, 1 G.D.R. 43, 45-46, 2 Am. Tribal Law 386, 389-91, 1999 WL 34976688 (1999); Tele Tech of Connecticut Corp. v. Dept. of Public Utility Control, 270 Conn. 778, 806, *610 855 A.2d 174 (2004). In interpreting the due process clause in both the Indian Civil Rights Act and The Mohegan Constitution MTO, 95-4, Section 301(c) directs the court to follow the common law of the State of Connecticut, unless it conflicts with Mohegan Tribal law.

DISCUSSION

The evidence on appeal established that the Surveillance Department at the Casino had a digital recording of Kiosk # 30 at the time the plaintiff claims he returned the $2,000.00 to the Kiosk. The Surveillance Department subsequently destroyed this digital recording. The Casino’s standard protocol calls for the preservation of surveillance footage for only seven days.
The plaintiff argues that the totality of the evidence shows the tape was destroyed not because of standard protocol, but because it was potentially exculpatory in nature; “it is reasonable for the Court to conclude from testimony and evidence .. . that had it been preserved and presented at the hearing it would have exonerated the plaintiff.” Plaintiffs Supplemental Brief, p. 11. Thus, the plaintiff concludes that the destruction of the surveillance tape was done in bad faith.
On the other hand, the defendant vigorously disputes that the evidence shows any bad faith and also disputes that any surveillance footage ever existed. Indeed, according to the defendant, the evidence even falls short of establishing that any alleged destruction was done intentionally. Because there is insufficient evidence to support a finding of intentional destruction, the defendant concludes that the Hearing Officer’s decision must be sustained based on this Court’s decision in Miller v. Mohegan Tribal Gaming Authority 2 C.D.R. 149, 6 Am. Tribal Law 543, 2005 WL 0239001 (2005), and Beers v. Bayliner Marine, 236 Conn. 769, 675 A.2d 829 (1996). Under both Miller and Beers. the plaintiff must show the destruction of the tape was intentional before it can be used to draw an adverse inference against the party destroying it.
The problem with the defendant’s reli anee on Miller and Beers is that both these decisions were made in the context of civil tort litigation which had no duo process implications because there was no exercise of governmental authority involved. In Beers, the Connecticut Supreme Court specifically noted that tho case raised an issue of first impression: “the issue of spoliation of evidence has not previously come to this court in the context of a civil case.” Id., at 774, 675 A.2d 829.
The Court in Beers then contrasted the rules governing the spoliation of evidence in a civil lawsuit between two private litigants with the spoliation of evidence by the police in a criminal case, where due process considerations are involved: “W>' recently decided the issue of spoliation of evidence in the context of a criminal case. See State v. Morales, 232 Conn. 707, 657 A.2d 585 (1995).” Id., at n. 8.
In Morales, the police had taken posses - sion of a leather jacket which the victim had been wearing at the time of a sexual assault. Without testing the jacket for alleged semen stains, the police returned the jacket to the victim in response to the victim’s repeated requests. The jacket was returned prior to the defendant’s arrest. At trial, “The defendant did not argue that the police, in returning the jacket to the victim, had acted in bad fail h or that they had any motive for doing so other than accommodating the victim". Id., at 712, 657 A.2d 585. Instead, the “defendant argued that the fact that the jacket was unavailable had irreparably harmed his ability to defend himself” Id,, thereby denying him due process of law *611 under the Due Process Clause of the Connecticut Constitution,
The Morales Court found the “issue in this case, concerns the failure of the police to preserve evidence that might be useful to the accused”. Id., at 714, 657 A .2d 585. It proceeded to employ a balancing test to determine if, under the totality of the circumstances, this failure to preserve potentially exculpatory evidence violated the right to due process under the Connecticut Constitution[5]. The factors to be balanced included “ ‘the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.’ ” Morales, at 719-720, 657 A.2d 585, quoting from State v. Asherman, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert denied, 470 U.S. 1050, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985).
A license revocation proceeding is civil, not criminal, in nature, and thus the instant case is distinguishable from Morales. Nevertheless, the exercise of governmental authority in revoking a license mandates a hearing that complies with procedural due process, which “is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands”. Thalheim v. Greenwich, 256 Conn. 628, 775 A.2d 947 (2001). In view of the flexible and fact-based nature of due process, the Court finds that the balancing test used in Morales takes into account the same factors that should be considered in deciding whether the destruction of the instant surveillance tape was so prejudicial as to deny plaintiff procedural due process at his license revocation hearing.
In applying the Morales test[6] here, where we find the destroyed tape was potentially exculpatory, the plaintiff need not prove that there was any bad faith in failing to preserve the evidence. Instead, “the reason for its nonavailability” is only one factor to be weighed in determining whether the plaintiff was afforded procedural due process. This is the rule not only under the Due Process Clause of the Connecticut Constitution, Article First, Section 8, but is also the rule in Connecticut’s sister states under their respective State Constitutions. Massachusetts, Commonwealth v. Henderson, 411 Mass. 309, 311, 582 N.E.2d 496 (1991); Vermont, State v. Delisle, 162 Vt. 293, 648 A.2d 632, 643 (1994); and Delaware, Hammond v. Stale, 569 A.2d 81, 87 (Del.1989).
In this case, the evidence falls short of establishing that the nonavailability of the surveillance tape was due to any bad faith. *612 Rather, the reason for its nonavailability appears to be that when the Surveillance Department was first consulted about the footage, the issue under investigation involved missing documentation and not the theft of $2,000.00. As a consequence, no effort was made at the time to preserve the surveillance coverage, which was said to be of “no assistance”. By the time the focus of the investigation had shifted to missing currency and a possible theft, the surveillance tape had already been destroyed under the seven day destruction protocol.
However, two of the other factors to be balanced in determining whether the plaintiff was denied due process by the destruction of the surveillance tape weigh heavily in plaintiffs favor. The materiality of the evidence which was destroyed is apparent—as Ms. Nevins testified during the course of the administrative hearing, “If I would have had the advantage of surveillance coverage, there would have been no question as to what happened.”
The second factor[7], prejudice to the plaintiff, is also clear: the missing surveillance tape, if the plaintiffs story is time, may well have supported him. At the very least, plaintiff was denied the opportunity to rebut what the Surveillance Department claimed was of no assistance in the investigation.
Significantly, the missing tape was not merely cumulative evidence. Rather, there was no direct evidence introduced at the administrative hearing linking plaintiff to the missing $2,000.00. The entire case against the plaintiff rested on negative inferences drawn from the fact that on the night of the alleged theft he took an “early out” and that he returned to Kiosk #30 before leaving the Casino.
Based on the above analysis, the failure to preserve the potentially exculpatory surveillance tape violated the plaintiffs right to procedural due process. While not every denial of procedural due process mandates a reversal of an administration decision and an entry of judgment in favor of the plaintiff, this case does require it. The Court can discern no other remedy that will fairly offset the prejudice the plaintiffs defense sustained as a result of the unavailability of the surveillance tape for his inspection.
Judgment shall enter for the plaintiff.

. A kiosk is a machine in the casino which can be used to dispense money to pay jackpots to patrons, instead of going to a cashier window.

. MTO 2002-13, Section 3(1) provides that "Not withstanding the provisions of subsection (h), (i), (j) or (k), the Gaming Disputes Court may, in its discretion, receive evidence and adjudicate any appeal de novo.”

. At the March 23, 2006 hearing, there was testimony that Ms. Ducheneau asked Surveillance to review footage for the wrong time due to a mechanical malfunction which re-suited in the $2,000,00 actually being dispensed earlier than the 1:56 a.m. time reported in the Casino’s transaction log. However, in Findings of Fact No. 10, the Hearing Officer found that the Kiosk payment was made “at 1:56 hours’’, which was in accordance with Ms. Ducheneau’s testimony at the administrative hearing that she was “looking for a jackpot slip generated at 1:56”. Administrative Transcript, p. 10.

. Plaintiff testified that he was questioned twice by Gaming Commission Investigators about the missing $2,000.00 and, after giving his explanation, was referred to tapes on the investigators' desk. Both times, the investigators told the plaintiff that the tapes told a different story, but his requests to review the tapes were denied. Although the defendant offered no testimony to contradict the plaintiff on this point, the Court gives minimal weight to statements by investigators that they were in possession of tapes since this: easily could have been only a ploy, to gain a confession.

. In employing a balancing test for potentially exculpatory evidence, the Connecticut Supreme Court expressly recognized that . .. "[tjhe due process clause of the Connecticut constitution shares but is not limited by the ⅛ content of its federal counterpart." Morales, i at 718, 657 A.2d 585. In so doing, it rejected the federal test for compliance with due prof cess where: "[Ujnless a criminal defendant ⅝, can show bad faith on the part of the police, failure to preserve potentially useful evidence f does not constitute a denial of due process of ) law,” Arizona v. Youngblood, 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), reh. denied, 488 U.S. 1051, 109 S.Ct. 885, 102 L.Ed.2d 1007 (1989). As a result of Morales, under the due process clause of the Connecticut Constitution, a defendant need not show the police acted in bad faith in (ailing to preserve potentially useful evidence.

. In adopting the Connecticut, Supreme Court’s approach in Morales to the failure to preserve potentially exculpatory evidence, instead of the United States Supreme Court's analysis in Youngblood supra, this Court is adhering to MTO 95-4, Section 301(c) which directs the Gaming Disputes Court to follow the laws of the State of Connecticut unless there is a conflict: with Mohegan Tribal law.

. In the instant case, the factor—"the likelihood of mistaken interpretation of it by witnesses or by the jury" is not a relevant one.